UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 22-cr-40(2) (JRT/LIB)

| | | |
|---|---|---|
| United States of America, | ) | |
|     Plaintiff, | ) | |
| | ) | **Memorandum of Law** |
| vs. | ) | **in Support of** |
| | ) | **Motion to Suppress** |
| Steven Anthony Shand, | ) | |
|     Defendant. | ) | |

### Introduction

Pursuant to FRCrP 12(b)(3)(C), Defendant Steven Shand respectfully submits this Memorandum of Law in support of his Motion to Suppress evidence which the government intends to offer at trial, but which was procured by means of unlawful search and seizure, as explained herein. (ECF 83).

### Background

Much of the relevant background information may be found in the original motion, (ECF 83), as well as the government's response thereto, (ECF 88). Additional background was elicited during the motions hearing conducted by the Court, (ECF 95), the contents of which are reflected in an official transcript, (ECF 100) ("Mot. Tr.").

**A.   Charged Offenses**

Originally, Defendant Mr. Shand had been charged by indictment with two counts of the offense known as "bringing in and harboring certain aliens," 8 U.S.C. § 1324(a)(1)(A)(ii). (ECF 12). Later, by superseding indictment, the government added a co-defendant to the case, and as to Mr. Shand charged additional counts containing

1

sentence-enhancement elements. (ECF 72). All charging documents specify the date of January 19, 2022, which coincides with the disputed seizure, described next.

### B. Disputed Stop-Seizure

At issue here is an official seizure conducted by a law enforcement officer employed by the United States Border Patrol (USBP). (ECF 83, at 2). To be more precise, on the above date, USBP Agent Christopher Oliver conducted a stop of the vehicle which Defendant Shand was then operating. (ECF 83, at 2). The stop was effected in Kittson County, at an area near the northern terminus of Minnesota which also forms the United States-Canada border; this "Stop Area" has been described as a roadway intersection at 180th Street and 410th Avenue North, (ECF 83, at 2), which may be depicted as below:



**Map 1:** Excerpt from Minn. DOT Map of Township of Saint Vincent (arrows and text added).[1]

---

[1] Full-sized original map available at:
https://www.dot.state.mn.us/maps/gdma/data/maps/township/kittson/saint-vincent.pdf

### C. USBP

USBP is a federal law enforcement agency, a principal function of which is to monitor the national border to "detect, deter, and apprehend people from illegally entering United States." (Mot. Tr., at 7; *see also* Mot. Tr., at 12 (listing these and other law enforcement objectives)). USBP claims no authority to enforce state or local laws, including traffic laws. (Mot. Tr., at 41-42).

Agent Oliver—who effected the official stop-seizure at issue here—is affiliated with the Pembina USBP Station in North Dakota, across the river from St. Vincent in Kittson County, and adjacent to a major interstate highway, which may be depicted as:



**Map 2:** St. Vincent & Pembina Area.[2]

---

[2] Created with Google Maps, available at https://www.google.com/maps

Though based at the USBP station in Pembina (*see* Map 2), in the main Agent Oliver patrols border-proximate areas located within Kittson County in Minnesota (*see* Map 1). (Mot. Tr., at 7-8).

### D. Stop Area

The Stop Area depicted in Map 1 is located at the intersection of gravel roads, near an industrial gas plant and approximately one-half mile south of the U.S.-Canada border ("Border"). (Mot. Tr., at 14-18). Agent Oliver conceded that it is not uncommon for a vehicle with out-of-state license plates to be operating in this particular area, *e.g.,* farm workers, recreational hunters, subcontractors for the gas plant. (Mot. Tr., at 28-29).

According to Agent Oliver, in the weeks leading up to the disputed January 19, 2022 stop-seizure, USBP agents had discovered footprints leading from the Canada side of the Border to the Stop Area intersection, with the surmised crossing activity apparently occurring on Wednesdays. (Mot. Tr., at 18). During that same timeframe, agents had discovered a backpack near the Stop Area, which contained a price tag denominated in currency associated with the Republic of India ("India" or "Indian"). (Mot. Tr., at 19).

### E. Weather Conditions

On the day before the disputed stop-seizure—January 18, 2022—the area at issue had been affected by a major winter storm, including snow, wind, and very low temperatures. (Mot. Tr., at 20-21). Conditions had improved by the following day—January 19, the day of the disputed stop-seizure—but remained quite difficult for travel, particularly on the gravel roads. (Mot. Tr., at 21-23). Wind-chill-adjusted temperatures were dangerously low as well. (Mot. Tr., at 23-24).

### F. Stop-Seizure

Nonetheless, Agent Oliver resolved that he would travel to the Stop Area, for the purpose of investigating suspected border-crossing activity referenced above. (Mot. Tr., at 22). He arrived at the Stop Area, near the above-referenced road intersection and gas plant. (Mot. Tr., at 24). He described his observations as follows:

> [A]s I approached the intersection from the south, I observed a vehicle turning to go north towards the gas plant. It was a white vehicle. * * * [A]s I got closer, I noticed it was a large white panel van going north.
>
> I observed it do a three-point turn at the intersection of 180th and 410, and then proceed back south. That it was moving at a slower rate than what you'd usually see on traffic. And I noticed that it was occupied by three occupants that I could see, and had an out of state license plate on it.
>
> * * *
>
> As [the driver] came up to the intersection and did his turnaround, it signified to me that he didn't have any business going east to the residence that was there or any of the farm infrastructure that was there. And he had to pass the main entrance of the gas plant twice, once going north and once coming south, which signified that he probably didn't have any business at the gas plant either.
>
> And on top of being at the exact intersection where we had had a pattern of traffic, almost within -- traffic might have been within ten yards of that intersection but always came to that intersection, made that turnaround pretty significant at that exact spot.

(Mot. Tr., at 24-26).

Based upon the above—and only the above[3]—Agent Oliver conducted an official stop-seizure of the white van ("Van"), based upon what he deemed reasonable suspicion of INA "alien smuggling" offenses. (Mot. Tr., at 29-30, 34, 53-54).

### G. Post-Stop

Having executed the above warrantless vehicular stop-seizure, Agent Oliver observed the Van was being operated by Defendant Mr. Shand. (Mot. Tr., at 29-30). Agent Oliver engaged Mr. Shand in questioning, resulting in production of a number of documents and eliciting a number of responses. (Mot. Tr., at 29-32). The stop also resulted in Agent Oliver being able to make certain observations, such as the presence of two passengers who appeared to be of Indian descent. (Mot. Tr., at 32-36). And also two mobile phone devices, as well as other physical items from inside the Van which law enforcement deemed inculpatory at to the charged offense. (Mot. Tr., at 37-38). All of this also resulted in Mr. Shand being arrested, based upon suspected "alien smuggling." (Mot. Tr., at 34, 37, 39).

Eventually, responding USPB officers encountered a group of individuals emerging from nearby fields, some of whom required medical attention due to exposure from the adverse weather conditions. (Mot. Tr., at 39-41).

---

[3] Other facts related by Agent Oliver, such as the seating capacity of the Van and its status as a rental vehicle, were discovered after the vehicular stop-seizure had occurred. (Mot. Tr., at 26-28). Hence, such post-stop observations could not have formed the factual basis for the disputed stop at issue here.

**Discussion**

**I.    The vehicular stop-seizure at issue was not justified by the requisite "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicle[] contain[ed] aliens who may be illegally in the country."**

   **A.    USBP "Roving Patrols" of Inland Roads**

The motion at hand implicates the Immigration and Nationality Act (INA), Pub. L. 82-414 (1952), *codified as amended at* 8 U.S.C. Ch. 12, §§ 1101-1537. The charged offenses are contained within the INA. *Supra* Background § A. And USBP's enforcement and search-seizure authority is cabined by the INA as well. *See, e.g.,* 8 U.S.C. § 1357.

A vehicular stop constitutes a Fourth Amendment seizure, and hence the general rule is that any such stop must be supported by probable cause or reasonable suspicion that the operator has violated a particular law, in this case the INA. *United States v. Linnell,* 93 F.4th 1102, 1105 (8th Cir. 2024). The general rule is subject to certain narrowly drawn exceptions, including the "border search exception" by which federal border control officers are authorized "to conduct routine searches and seizures <u>at the border</u>, without probable cause or a warrant." *United States v. Xiang,* 67 F.4th 895, 897 (8th Cir. 2023) (citation omitted).

However, the narrow border exception <u>*does not*</u> extend to "roving patrols" and associated vehicular stops, conducted by USBP upon inland roads. *Almeida-Sanchez v. United States,* 413 U.S. 266, 273 (1973). The vehicular seizure at issue here was conducted upon inland roads and not "at the border" or its functional equivalent. *See, e.g., United States v. Singh,* 415 F.3d 288, 294 (2d Cir. 2005) ("Although the investigatory stop in the

case before us was along a road extending along the border, we note that it was conducted by a roving patrol, not at a checkpoint, and was on a road with significant domestic traffic."). Further, the USBP witness did not and does not have evidence that the vehicle Mr. Shand was driving had ever crossed the Border. (Mot. Tr., at 51).

In such situations, the Supreme Court has held that a reasonable-suspicion standard applies to an INA-related vehicular stop:

> Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country.

*United States v. Brignoni-Ponce,* 422 U.S. 873, 884 (1975).

### B. *Brignoni-Ponce* Factors

Accordingly, the disputed vehicular stop at issue may be deemed lawful only to the extent justified by a reasonable suspicion of an INA violation, in this case "alien smuggling." (Mot. Tr., at 29-30, 34, 53-54). The government bears the burden to prove law enforcement possessed the requisite reasonable suspicion to effect a warrantless stop. *United States v. Andrews,* 454 F.3d 919, 922 (8th Cir. 2006). In *Brignoni-Pence,* the Supreme Court articulated factors that may inform the inquiry: (1) characteristics of the area in which the vehicle is encountered, *e.g.,* proximity to border, usual traffic patterns, and/or previous experience with trafficking; (2) information about recent illegal border crossings; (3) driver behavior such as erratic driving or obvious attempts to evade officers; (4) aspects of the vehicle, such as large passenger compartments or passengers attempting to hide. 442 U.S. at 884-85.

*(1). Characteristics of Area.* Here, the USBP officer encountered the Van at the Stop Area, located on a gravel road approximately one-half mile from the Border. (Mot. Tr., at 14-18; *see* Map 1). However, the Stop Area is located adjacent to an industrial gas plant, and the officer conceded that contractors were known to operate similar vehicles in that area. (Mot. Tr., at 14-18, 28-29). The officer also conceded that seasonal workers or recreational hunters were known to frequent the area as well. (Mot. Tr., at 28-29). Only recently had the area been considered a suspected border-crossing point; certainly not a well-known or -established area for any such activity. (Mot. Tr., at 16 ("So as a whole, our area of responsibility historically has been pretty slow. * * * And it was the first time in my 14 years up there * * * that we overtly saw what we thought was an organization using that area on a regular basis.")).

In addition, the Stop Area is located just a few miles from nearby towns, including Pembina which is adjacent to a major interstate highway system. (Mot. Tr., at 43-46; *see also* Map 1 & Map 2). The USBP officer conceded that travelers have been known to get lost in the general vicinity, if not the particular Stop Area. (Mot. Tr., at 44, 52-54). And of course the events at issue here occurred during poor road and weather conditions, when the risk of losing one's bearings increases.

Hence, this first *Brignoni-Pence* factor fails to support the requisite reasonable suspicion, necessary to justify the vehicular stop at issue here.

*(2). Recent Illegal Border Crossings.* The USBP officer stated that, in the weeks leading up to disputed stop, law enforcement had observed footprints leading from the Canadian side of the Border, to the intersection located at the Stop Area. (Mot. Tr., at 18).

Detection of such footprints can be a factor in the *Brignoni-Pence* reasonable suspicion analysis. *United States v. Cortez,* 449 U.S. 411, 420 (1981). However, the mere presence of a vehicle near a footprint area cannot serve as the sole basis for vehicular stop-seizure; such reasoning would broadly justify law enforcement intrusions of any and all motorists who happen to be driving along a given stretch of roadway. *See Cortez,* 449 U.S. at 420-21 (law enforcement theory reasonably limited targets to particular vehicle types, traveling in particular area, at particular time of day; thus limiting universe of targets to just one); *see also, e.g., Johnson v. Phillips,* 664 F.3d 232, 237 (8th Cir. 2011) (citing *Brown v. Texas,* 443 U.S. 47, 52 (1979)) ("[A] person's presence in a suspicious location does not, in and of itself, provide law enforcement with a reasonable, articulable suspicion" to conduct an investigatory stop).

Here, the USBP officer failed to tailor the criteria that would justify an investigatory vehicular stop as in *Cortez*; rather, the officer relied upon the Van's mere presence in a suspicious location, forbidden under *Brown*. Hence, this second factor also fails to justify the stop-seizure at issue.

*(3). Driver Behavior.* Under *Brignoni-Pence,* driver behavior "such as erratic driving or obvious attempts to evade officers can support a reasonable suspicion." 422 U.S. at 885. However, by the USBP officer's own account, the operator Mr. Shand merely drove to an intersection, turned around, and proceeded to drive the other direction. (Mot. Tr., at 24-25). And at a "slower rate than what you'd usually see," (Mot. Tr., at 25), which is best attributable to the weather and road conditions, and certainly does not constitute "erratic

driving or obvious attempts to evade officers." 422 U.S. at 885. This third factor fails to justify the vehicular stop as well.

*(4). Aspects of Vehicle.* Last, the Supreme Court has held that certain observations concerning the vehicle itself might be relevant in the reasonable-suspicion analysis, such as whether the particular make/model of vehicle is known to be "frequently used for transporting concealed aliens," or whether the particular vehicle in question contains an "extraordinary number of passengers" or "persons trying to hide." 442 U.S. at 885. Here, the USBP officer noted the Van was "large," but evidently no more so than similar worker/hunter/contractor vehicles that were known to traverse the area from time to time. (Mot. Tr., at 20, 25-26, 28-29). Certainly the officer did not claim there was some noticeable aspect of the Van which was uniquely indicative of human transport; and in fact the officer did not observe the vehicle's seating capacity until after the stop had occurred. (Mot. Tr., at 26-27). The officer observed just two passengers in the Van, and reported no suspicious activity by either. (Mot. Tr., at 26). Accordingly, this final factor fails to justify the vehicular stop at issue, just as with the prior factors discussed above.

Because the *Brignoni-Pence* factors fail to establish reasonable suspicion required to justify the warrantless vehicular stop at issue, it must be concluded that that the stop was unlawful and in violation of the Fourth Amendment. 422 U.S. at 885-87. The question then becomes one of the appropriate remedy, discussed next.

### C.   Exclusion of Direct and Derivative Fruits

"If [an] investigatory stop is not justified by reasonable suspicion or if the investigating officers exceed the stop's proper scope, any evidence derived from the stop is inadmissible at trial." *United States v. Wheat,* 278 F.3d 722, 726 (8th Cir. 2001) (citations omitted). "[T]he exclusionary rule encompasses both the primary evidence obtained as a direct result of an illegal search or seizure and [] evidence later discovered and found to be derivative of an illegality, the so-called 'fruit of the poisonous tree.'" *Utah v. Strieff,* 579 U.S. 232, 237 (2016) (cleaned up). Under some circumstances, the exclusionary rule can extend to testimony of witnesses, when ascertained by means of unlawful search or seizure. *United States v. Wipf,* 397 F.3d 677, 683-85 (8th Cir. 2005).

Based on the above principles, Defendant Mr. Shand respectfully requests that the Court issue a Report and Recommendation (R&R), which suggests an order suppressing/excluding any direct or derivative evidence procured as a result of the unlawful Van stop-seizure, including: (1) mobile phone devices and evidence derived therefrom; (2) law enforcement observations of the interior of the Van, and any physical items seized therefrom; (3) statements elicited from Mr. Shand; and (4) testimony of any passengers of the Van at the time of the unlawful stop.

**Conclusion**

For the above reasons, Defendant Mr. Shand respectfully requests that the Court issue a R&R, to the effect that: (1) his motion to suppress (ECF 83) should be granted; and (2) the directive and derivative fruits of the challenged stop-seizure should be suppressed.

Dated:  June 4, 2024                                          Respectfully submitted,

*s/ Aaron Morrison*

AARON J. MORRISON
Attorney ID No. 0341241
Attorney for Mr. Shand
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415