SUNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. 22-CR-40 (JRT/LIB) |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | **STEVE SHAND'S** |
| | ) | **SENTENCING POSITION** |
| STEVE ANTHONY SHAND, | ) | |
| | ) | |
| Defendant. | ) | |

The American Dream has created a powerful draw to our country. People leave behind familiarity and families to come to the United States. Many face grave dangers crossing the borders in search of the promise of America. Unfortunately, on January 18, 2022, those dangers proved fatal. The eleven who set off from the Canadian side of the border had willingly traveled thousands of miles from India for a chance of coming to America. For the chance of making a better life for themselves and their loved ones. As we heard, when the eleven arrived on the border it was dark and cold. They were not forced to travel to the United States, they ventured into the cold night because they wanted a better future for themselves and for their loved ones. Unfortunately, the cold was extreme. The devasting tragedy that unfolded over the next many hours is unimaginable. Steve Shand played a role in that tragedy. But Mr. Shand's role in this offense does not demand the retribution the Government seeks. The Government's proposed sentence is unduly punitive.

The family tragedy that is at the center of this case has garnered a good deal of coverage in the media. The tragic death of the family deserves our sympathy. But sentences are not based solely on sympathy for the victims. Sentences must also account

1

for culpability within the offense and the life history of the person who stands convicted before the Court. Mr. Shand was there and as a result he has a level of culpability. But the Court heard that his role was limited. He was a driver employed by the smugglers. He was given a set fee for a specific service. That service was to pick people up at a predetermined location on a certain date and time. A location, date, and time Mr. Shand did not pick. After picking the people up, his role was to drive those people to a location provided once again by real conspirators. What we do know is that Mr. Shand was on the outside of the conspiracy, he did not plan the smuggling operation, he did not have decision making authority, and he did not reap the huge financial benefits as the real conspirators did.

And when the Court looks at the man who is Mr. Shand, it is easy to see why the conspirators used him. Mr. Shand is a simple man who grew up with nothing and was working hard to provide a better life for his family. A man with no criminal history. A man who was reliable at his job as a taxi driver. A man who needed money to support his family.

When the Court balances his role in the offense, his life history, and his otherwise law-abiding life, a fair sentence, a sentence that I ask this Court to impose, is 27-months.

I.   **The PSR's Guideline calculations.**

    A.   **Objection to the 10-level enhancement pursuant to U.S.S.G. § 2L1.1(b)(7).**

Mr. Shand objects to the PSR's calculation that the total offense level is 28. (PSR ¶ 41). Specifically, he objects to the PSR's determination that the 10-level enhancement

in U.S.S.G. § 2L1.1(b)(7) applies in this case. (PSR ¶ 33). Section 2L1.1(b)(7) calls for an offense level increase "if any person died or sustained bodily injury." The Eighth Circuit has ruled that the enhancement only applies if the death or bodily injury is "causally connected to dangerous conditions created by the unlawful conduct." *United States v. Flores-Flores*, 356 F.3d 861, 862 (8th Cir. 2004).

The PSR applies the enhancement on the basis that §1B1.3(a)(3) indicates that all harm that resulted from the offense is relevant conduct, and that the four deaths in this case occurred from hypothermia while Mr. Shand was assisting Patel to smuggle noncitizens[1] across the border in extreme weather conditions. (PSR p. 26). The PSR also suggests that Mr. Shand's false statements to law enforcement that no additional noncitizens were missing may have delayed a rescue and caused the deaths. (PSR p. 26). The PSR's application of the enhancement is an overly broad application that does not recognize the limiting nature of *Flores-Flores*.

In *Flores-Flores*, Flores "smuggled eleven individuals for money in an overloaded van on a nonstop two thousand mile trip over interstate highways without the benefit of seatbelts for eight of the passengers." 356 F.3d at 862. During the trip Flores also directed one of the passengers to drive the van and failed to ensure the driver stayed awake. *Flores*, 356 F.3d at 863-63. As a result of Flores' actions, the van crashed, and two passengers died. *Flores*, 356 F.3d at 863. In applying the enhancement to Flores, the Eighth Circuit found, "The deaths of the two passengers seated in an open area in the van's

---

[1] Pursuant to *Barton v. Barr*, 590 U.S. 222, 226 n.2 (2020), Mr. Shand will use the term "noncitizen" as equivalent to the statutory term "alien."

3

rear were causally connected to the dangerous conditions created by Flore's unlawful conduct." *Flores*, 356 F.3d at 863. While the jury found Mr. Shand was part of the smuggling in this case, Mr. Shand's actions did not create the unlawful conduct that led to the deaths in this case. He did not choose the date, time, or location of the border crossing. He did not drop the noncitizens off on the Canadian side of the border. He did not force anyone to cross the border. He was not involved in clothing the noncitizens or providing instruction on how to cross the border. His role of being on the United States side of the border did not create the dangerous conditions that resulted in the noncitizens deaths. Had Mr. Shand declined to provide aid to a noncitizen who got into his van, then the enhancement would appropriately apply. But that is not the case. As for the PSR's suggestion that Mr. Shand's failure to inform law enforcement that other noncitizens may have been unaccounted for at the time of his arrest, the evidence was clear that by that point the deaths had already occurred.

    **B.    Response to the Government's request for a 6-level increase pursuant to U.S.S.G. § 2L1.1(b)(2)(B).**

The Government seeks a 6-level increase based on the belief Mr. Shand helped smuggle additional individuals. Mr. Shand joins the PSR reasoning in why a 6-level increase pursuant to U.S.S.G. § 2L1.1(b)(2)(B) should not be applied. (PSR pp. 21-22). As the PSR notes, beyond the 11 noncitizens involved in the January 18, 2022, smuggling event, the precise number of individuals smuggled on any other occasion or even their legal status is unknown. To double the § 2L1.1(b)(2)(B) enhancement from 3-levels to 6-levels requires this Court to assume facts as to the precise number of additional individuals

smuggled and their legal status. While there is evidence to support other trips were made by Mr. Shand, there is insufficient evidence for this Court to determine the number of individuals involved in those trips. Additionally, while the Court can assume the individuals were noncitizens, given the complete lack of evidence identifying who the individuals were, the Court would have to guess as to their legal status. Making assumptions about these specific facts does not meet the preponderance of the evidence standard. The PSR properly excluded the enhancement.

    **C.**    **Response to the Government's request for a 2-level increase pursuant to U.S.S.G. § 3A1.1(b)(1).**

The Government also argues that Mr. Shand should receive a 2-level increase because the noncitizens in this case were vulnerable victims. (PSR pp. 22-23). Specifically, the Government argues the increase applies because the offense involved two young children and that Indians are unfamiliar with cold weather or snow. (PSR p. 23). The PSR again correctly excluded the increase.

The PSR correctly identifies that as a threshold matter, the noncitizens in this case must meet the legal requirements of a victim. As the PSR identifies, a person is not a victim for §3A1.1(b)(1) purposes if that person is a voluntary participant in the crime of conviction. (PSR p. 24). In this case, the evidence shows the noncitizens were voluntary participants in the crime of being brought to the United States. There is no evidence the noncitizens were kidnapped or forced to leave India and travel to the United States. The noncitizens voluntarily decided to come to the United States. As such, the noncitizens are appropriately considered customers of the conspiracy rather than victims of the crime of

conviction, because they voluntarily joined the scheme as willing participants to its objectives—namely to be brought illegally into the Unites States. *See United States v. Velasquez-Mercado*, 872 F.2d 632, 636 (5th Cir. 1989); *United States v. Angeles-Mendoza*, 407 F.3d 742, 747 (5th Cir. 2005); *United States v. Wright*, 12 F.3d 70, 74 (6th Cir. 1993).

Of course, this does not mean, as the Fifth Circuit recognized in *Angeles-Mendoza*, that relevant conduct under §1B1.3(a)(3) cannot turn a willing participant into a victim. A noncitizen who voluntarily enters into a scheme to be illegally brought into the United States would certainly become a victim if a defendant were to then hold that person against there will after being brought into the United States. Or as the PSR explains, "conduct that constitutes victimization of the aliens would require engaging in further acts committed outside the scope of the voluntary smuggling agreement…" (PSR p. 24). And as the PSR concludes, those further acts, "did not occur in this case." (PSR p. 24).

As to the Government's claim that the noncitizens did not have experience with winter weather and therefore were vulnerable, the PSR correctly concludes this is an oversimplification and generalization. Just as the United States has a wide and varying climate so too does India. The PSR correctly concludes there is no evidence that Mr. Shand was aware of the winter weather knowledge level of the noncitizens. Additionally, Mr. Shand did communicate to Patel his concerns about the weather and asked Patel to make sure the noncitizens were adequately prepared. Patel confirmed to Mr. Shand that the noncitizens would be appropriately dressed for the winter weather. Given Mr. Shand's own lack of personal experience with winter weather it was reasonable for him to rely on Patel's representations the noncitizens were appropriately dressed. As for the

6

vulnerability of the two children, the commentary to the sentencing guideline as referenced by the PSR provides the correct guidance for the Court.

### D.  The resulting sentencing guideline calculation.

Mr. Shand submits the correct sentencing guideline calculation in this case is a base offense level of 12 - §2L1.1(a)(3); a 3-level increase for the 11 noncitizens - § 2L1.1(b)(2)(A); and a 3-level increase for creating a risk a serious injury - § 2L1.1(b)(6), for a total offense level of 18 and a criminal history category of I resulting in a guideline range of 27-33 months.  Mr. Shand submits that in this case, the §3553(a) factors support a sentence within this range.

## II.   A 27-month sentence accomplishes the goals of sentencing.

Considering the 18 U.S.C. § 3553(a) factors—including the nature and circumstances of the offense; Mr. Shand's history and characteristics; the need for the sentence to reflect just punishment, deterrence, and public safety; and avoiding unwarranted disparities—a 27-month sentence is "sufficient, but not greater than necessary, to" achieve the purposes of sentencing. 18 U.S.C. § 3553(a).

Steve Shand described his memories of growing up in Jamaica as populated by things he should not have seen.  His mother's schizophrenia made her incapable of caring for him as a young boy.  She was often violent and simply missing from his life.  His father left his mother when Mr. Shand was still very young.  His stepmother never accepted Mr. Shand as part of the family and when the violence between his father and stepmother occasionally ebbed, the two would direct their pent-up rage toward Mr. Shand. And so, he grew up witnessing violence and experiencing it firsthand.  His childhood was

one of physical and mental abuse within his father's home. And a cycle of ups and down with his mother as she drifted in and out of his life. His few positive memories of childhood are the up times he had with his mother. Those few good times offered glimpses of what Mr. Shand believed family life was meant to be. Unfortunately, the flipside of the up times was that the periods were fleeting as his mother frequently dipped back into the grip of her mental illness.

It is no surprise that at eighteen Mr. Shand left his family. As reported in the PSR contact with his father fell off until there was none. With time he grew to understand that the tumultuous relationship with his mother was beyond her control. With that understanding, he formed a relationship of sorts with her. And as written in one of his letters of support, Mr. Shand always did his best to look after her even after he moved to the United States.

And like many people through time, his move to the United States gave Mr. Shand opportunities he never could have imagined growing up in Jamaica. In 2002, when he met an American woman in Jamaica, he took the chance to come to America when she invited him to have a life with her here. He married and brought his son from a previous relationship to the United States. Over time he became an American citizen. After his wife died in 2011, he concentrated on raising his children. He relocated to Florida to be near his brother. He worked hard to provide for his family and to provide for his children a life that he never had. In 2017, he started his taxi company. In 2019, he married his current wife. They bought a house in Florida and became a blended family with his two sons and his wife's four children. His vow to be a better parent than his own parents

8

extended to his stepchildren. The financial strains of his new extended family were great. And, unfortunately, his feeling of obligation to provide for his family clouded his judgment.

In 2021, Mr. Shand met Patel. His taxi business was up and down. Patel provided one of Mr. Shand's most reliable revenue streams, driving people to and from Patel's gaming casinos. It was steady work and Patel paid well. In late 2021, Patel offered Mr. Shand a way to make more money. As the Court heard, Patel's new arrangement was for Mr. Shand to fly to Minnesota and drive people from the border to the Chicago area. The thousands of dollars Patel paid for the trips clouded Mr. Shand's judgment. The promise of fulfilling his obligations to his family undoubtedly caused him to rationalize his actions. Rationalization colored by his own experience of yearning for a better life and experiencing at least in part the advantages that a life in America affords. So, he drove for Patel. He ignored the illegality and thought about the good life the individuals he picked up would have in America. The better life they would be able to provide for their families. A better life, just like the one he was fortunate enough to receive by his own coming to America.

Unfortunately, this case ended in a horrible tragedy. Certainly not something Mr. Shand ever wanted to happen. Like those involved in this case Mr. Shand came to America to build a better life for himself and his children. He became involved in something that was illegal. He knows that as a result of the verdict in this case he will be punished. Certainly his path to his sentencing day has not been a straight one. The Court knows Mr. Shand decided to take a different path than the one he started on. Mr. Shand has his reasons. The passing of three years before trial had an influence. There are

others. Regardless he will soon be before the Court facing a prison sentence. Mr. Shand is that person who stands before the Court, a good man, an otherwise law-abiding man, having been convicted of committing a crime, a crime he committed at one distinct time in his life. He is not a heartless lifelong criminal. He is a man who made a bad decision based on a deep-rooted belief that to fail in supporting his family is to fail as a man. He rationalized what he did and was likely influenced, whether he knew it or not, by his own immigrant experience.

The evidence at trial was heartbreaking. The evidence was also clear that Mr. Shand had little say in the overall smuggling operation. He was an employee of the organization. He was a taxi driver. His limited role sets him apart from the other conspirators. His culpability is not the same as those in charge. His role was an act of aberrance. The proof of his aberrant behavior is found in his flawless compliance while on pretrial release. Mr. Shand has no criminal history. He has been on pretrial release since January 22, 2022, and has complied with all conditions. (PSR ¶6). For 3 ½ years Mr. Shand has lived the same law-abiding life he lived before he met Patel. This case involved an isolated course of conduct of an otherwise very good man. The people in his life know the good man he is:

> Steve is the kind of father who puts his children first in every way. He is present, nurturing, and emotionally invested in their well-being. I've seen firsthand how he dotes on them, always striving to give them the kind of life and security that he may not have had growing up. His love is not only felt – it is shown in his actions, his sacrifices, and the way he lights up when speaking about their future.

## CONCLUSION

In light of the circumstances of the offense, Mr. Shand's history and characteristics, he requests that the Court impose a sentence of 27-months. A reasonable for sentence for a good man.

Dated:   May 14, 2025.                    Respectfully submitted,

                                              *s/ Aaron Morrison*

AARON J. MORRISON
Attorney ID No. 341241
LISA M. LOPEZ
Attorney ID No. 395791
Attorneys for Mr. Shand
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415