UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

|  |  |
|---|---|
| United States of America, | ) File No. 22-cr-40 |
| | )         (JRT/LIB) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Fergus Falls, Minnesota |
| | ) May 28, 2025 |
| Steve Anthony Shand, | ) 2:38 p.m. |
| | ) |
| Defendant. | ) |

------------------------------------------------------------

BEFORE THE HONORABLE JOHN R. TUNHEIM
UNITED STATES DISTRICT COURT JUDGE

**(SENTENCING HEARING)**

**APPEARANCES:**

| | |
|---|---|
| For the Plaintiff: | U.S. Attorney's Office |
| | LISA D. KIRKPATRICK, AUSA |
| | 300 South Fourth Street |
| | 600 U.S. Courthouse |
| | Minneapolis, Minnesota 55415 |
| | |
| For the Defendant: | Federal Public Defender's Office |
| | AAR0N J. MORRISON, ESQ. |
| | LISA M. LOPEZ, ESQ. |
| | 300 South Fourth Street |
| | 107 U.S. Courthouse |
| | Minneapolis, Minnesota 55415 |
| | |
| Court Reporter: | LORI A. SIMPSON, RMR-CRR |
| | 300 South Fourth Street |
| | 1005 U.S. Courthouse |
| | Minneapolis, Minnesota 55415 |

Proceedings reported by certified court reporter; transcript produced with computer.

**P R O C E E D I N G S**

**IN OPEN COURT**

*(Defendant present)*

THE COURT: Good afternoon, everyone. This is Criminal Case Number 22-40, United States of America vs. Steve Anthony Shand. We are here for sentencing.

Counsel, would you note your appearances, please.

MS. KIRKPATRICK: Good afternoon, Your Honor. Lisa Kirkpatrick on behalf of the United States, and seated with me at counsel table is the case agent, Special Agent Jimenez.

THE COURT: Good afternoon to both of you.

For the defense?

MR. MORRISON: Good afternoon, Your Honor. Aaron Morrison and Lisa Lopez appearing on behalf of Steve Shand, who is present in the courtroom.

THE COURT: Good afternoon to both of you.

And Mr. Shand, how are you doing today?

THE DEFENDANT: I'm okay, sir.

THE COURT: Good.

All right. We're here for sentencing on the conviction, three counts. In preparation for sentencing, the Court has carefully read the presentence report that has been prepared by the Probation Office. The Court has also

conferred with the Probation Office concerning that report, read the position papers filed by each side, and looked back at matters relevant to the trial. And I also read letters received on behalf of Mr. Shand. We have, I believe, three letters here. Yeah, I'm counting correctly. I appreciated receiving them.

All right. Mr. Morrison, did you have enough time to work with the Probation Office to fully consider the draft presentence report?

MR. MORRISON: Yes, Your Honor.

THE COURT: Okay. Which objections do you wish the Court to address today?

MR. MORRISON: I guess, Judge, given the fact that all of the same objections were present in Mr. Patel's hearing, if the Court intends to rule the same, I -- unless the Court wishes me to make a further record than I made in my written submissions, I would defer to that.

I would like to just make a little bit more of a record regarding the enhancement, the ten-level increase, for the death part of this, but I'll take some direction from the Court on what you would like me to supplement or add or argue or --

THE COURT: That's fine. Your proposal is fine with the Court, Mr. Morrison.

MR. MORRISON: Okay. Your Honor, I did raise an

objection to Pretrial's argument or suggestion that there should be a ten-level increase for the deaths in this case.

As the Court is aware from my written submissions, I am relying on Eighth Circuit law that addresses this and suggests that it's more in our circuit than just a death occurred, but that Mr. Shand has to play a role in that causation.

And I want to take from the government's position pleading on Mr. Patel, and I think what they wrote about Mr. Patel speaks directly to why this enhancement doesn't apply to Mr. Shand.

In ECF Number 228, on page 16, the government writes, in regards to Mr. Patel, (As read) "The evidence at trial showed that Mr. Patel recruited Mr. Shand, that Mr. Patel coordinated his travel activities, that Mr. Patel coordinated the migrants getting across the border, that the text messages repeatedly showed that Mr. Shand relied on the geocoordinates and address from Mr. Patel to carry out the smuggling, that Mr. Patel would tell Mr. Shand 'be ready,' that Mr. Patel would tell Mr. Shand when the next trip was going to occur."

Just as this Court said in your remarks to Mr. Patel, it is -- it was the people on the other side of the border, it was Mr. Patel who could have said that night, "We're not doing it tonight. It's too cold." That wasn't

something that was in Mr. Shand's control. He didn't cause those noncitizens to get out of the vehicle on the Canadian side and cross the border that night.

And I certainly am going to raise this in my argument about what the proper sentence is, but I think that in the context of all of the sentencing enhancements and guideline calculations in this case, what this Court also addressed early on in Mr. Patel's sentencing is that, yes, it is a sad, tragic death that anybody died that night.

It's a sad, tragic death -- sad, tragic case that this government, this U.S. Attorney's Office, prosecutes people who cross the border in the search of the hope that Ms. Kirkpatrick spoke about during Patel's.

But the reality is if that we are going to play that game, we have to also recognize that under the law Mr. Patel is culpable -- or Mr. Shand is culpable for his role in the offense conduct.

And we can't forget that in this case the 11 who crossed the border that night or attempted to cross the border that night, in the context of deciding a sentence in this case, were customers, were committing an illegal act; that we have to be careful when we can call them victims for dying.

We can call them victims of our government's decision not to allow more people to come to our country to

get a better life, we can have sympathy for that, but in the criminal context, we cannot forget that here this Court has to also judge them as players in this illegal act.

And in this case the deaths here, the culpability, the causation, as the *Flores-Flores* case requires this Court to find, is on Mr. Patel; is on, in this instance, for this legal issue, the noncitizens who attempted to cross that night; and not on Mr. Shand, who was concerned, who did repeatedly talk about the cold, who did ask that they be prepared, who showed concern. And he showed concern not just to Mr. Patel, but in the text messages we saw at trial to his own wife about the concern for them and their lives.

So in this case the ten levels may very well apply to Mr. Patel because of his direct involvement in sending the people across the border without proper clothing, but that wasn't something that Mr. Shand caused and so the ten levels shouldn't apply to him in this case.

THE COURT: All right. Thank you, Mr. Morrison.

Ms. Kirkpatrick, let's get your response here and then any objections you wish the Court to address.

MS. KIRKPATRICK: Certainly.

With respect to the ten-level enhancement, I think it's important to note that it applies to death or injury and that the defendant's conduct caused it. It certainly did.

The defendant was stuck in the snow. That delayed the entire trip. And what did he do? He did not call for help. He did not alert authorities that there are people out in the snow searching for me.

The passerby who pulled his van out of the ditch testified that had he known, had Mr. Shand told him that there were people out there, he would have gone looking for them. He didn't.

And the timeline in this case, and as noted by the probation officer, shows that a timely search probably would have prevented these deaths. But Mr. Shand didn't tell anybody about those migrants who were out there. He didn't tell the passerby. And when the Border Patrol agent asked him specifically, "Are there more people out there?" he said, "No."

And the time between that encounter and 3:00 p.m., when the Patel family was found, they probably would have been alive. The other migrants were alive. The Patels were probably alive.

And then we also have to look at the injuries to that fifth migrant. It's not just death, as I said. It's death or injuries. Mr. Patel [sic] is the one who knew how cold it was, and I'll talk about this more in my position pleading, but he's the one who experienced it. He's the one who was there.

THE COURT: Mr. Shand, you mean?

MS. KIRKPATRICK: I'm sorry.

THE COURT: Yeah.

MS. KIRKPATRICK: Mr. Shand. He's the one who was there. He's the one who knew how cold it was, and yet he allowed those migrants to search on foot for hours looking for him and his flashing lights in the ditch. And we saw those injuries that that conduct, Mr. Shand's conduct, resulted in.

So we think that all the facts in this case, both the deaths that resulted, as well as the injuries to the fifth migrant, support the enhancement.

If there are no questions about that enhancement, I'll also follow the same tact that Mr. Morrison followed. Your Honor, we certainly respect your rulings in the Patel sentencing, which, of course, is a different record and it occurred right beforehand, but we would make the same arguments, persist in our objections as noted in our pleadings, but rest on the record there.

THE COURT: All right. Very well.

Anything else you wanted to say, Mr. Morrison?

MR. MORRISON: No, Your Honor.

THE COURT: Okay. All right. Okay. I will rule in the same manner as I did for the objections raised in the Patel sentencing and will rely in part on the record from

that sentencing that we will incorporate here.

Just repeating, the Court did not apply a two-level increase for vulnerable victims based on the language of the guidelines. The children in particular and parents who died were customers of the scheme, not technically victims under the guidelines. And also relevant to that argument is the fact that Indian immigrants generally should not be considered more vulnerable based on the cold weather.

And also the number of immigrants smuggled will remain at 11 based on my concern that we did not have enough evidence to support a larger number and therefore the enhancement just for six or more is what will apply.

And the bodily injury issue, I will overrule the objection of the defense. I do think that Mr. Shand played some role, less so probably than Mr. Patel, in the death and/or injuries, but at the same time, Mr. Kirkpatrick is correct, there's no record of him calling for help, telling the pipeline plant worker that there were other people out there, and also saying that there were no other people out there to the Border Patrol, which could have helped in finding the family of four before they expired due to the cold. And I also take into account the injuries, severe injuries, of frostbite to the fifth migrant. So therefore that objection is overruled.

We don't have a role issue in this case.

All right. Anything else on objections?

MS. KIRKPATRICK: Nothing from the government.

MR. MORRISON: No, Your Honor.

THE COURT: Okay. All right. I'll find the guidelines and then we will talk about what the appropriate sentence should be.

So the Court will find that the base offense level in this case is level 12, and then we would add three levels because of the six or more unlawful aliens that are -- there was a preponderance of the evidence proved during this trial. There is a three-level increase because of the intentional reckless creation of a substantial risk of death or bodily -- serious bodily injury, a ten-level increase because four migrants died of hypothermia, so there was death or sustained bodily injury, and a fifth who was injured severely by frostbite.

And the Court will find that Mr. Shand is an average participant here, so there are no points to add there.

We have an adjusted offense level of 28. And so level 28 with a Criminal History Category of I does yield a guideline range of 78 to 97 months, a supervised release range of one to three years, a fine range of $25,000 up to $250,000, a restitution which is mandatory but not

requested. Am I correct?

MS. KIRKPATRICK: That is correct, Your Honor.

THE COURT: Okay. And there's a special assessment -- I think the special assessment is $300. Am I correct?

PROBATION OFFICER: $400, Your Honor. Four counts of conviction.

THE COURT: Did we have four counts here? I can't remember. It says three here. Four?

LAW CLERK: It's four.

THE COURT: Missed one on the list here. Okay, $400.

All right. Now let's focus on what the appropriate sentence should be. Let's hear from you first, Mr. Morrison, and then Ms. Kirkpatrick. And Mr. Shand, you have a right to speak today.

MR. MORRISON: Obviously any time a lawyer goes to trial with their client, it becomes a different relationship. When we meet a client at initial appearance and they decide they want to take a deal early on, you most often don't spend a lot of time with a client. You don't travel to Duluth for motion hearings and pick them up at the airport. You don't stay with them over a week of trial in Fergus Falls.

And it's in that extra time, that time where a

lawyer and a client stop being lawyers and clients and occasionally just are two human beings together, that the real character of a person comes out.

Mr. Shand, when he's not answering my questions about the case and trying to be helpful, in those times he talks about his children and the smile, the lightness, the proud father that he is.

The other thing, I think, maybe people don't understand is all of the life's story that so many of our clients have, that we heard about Mr. Patel, that this Court has read about Mr. Shand, we, as attorneys, often don't learn about that until much later on, too. And so when you go to trial with somebody, you don't necessarily know that back story until you're sitting down with Mr. Smith and he's asking the questions.

And it was so striking to me to hear a man who worked so hard running his taxi business, doing what he can, buying a house, bringing in this blended family from his wife, taking care of them all like they're his own kids; to hear his life story, his story of trauma, a mother who is mentally ill and couldn't take care of him, abandoned him, not because she wanted to or he was a bad kid, but because of her mental illness; a step -- or a father who married somebody who wanted to have nothing to do with him, who abused him. Yet he set all of that aside. He has pushed

that into a corner of himself and instead what was in its place was this desire to provide, to be something better than his father.

His entire life, nothing, not a hint of crime, not a hint of doing anything but working hard, coming to America legally, becoming a legal United States citizen, filling out all the paperwork, doing everything he needed to achieve the American dream, not really for himself, but for his children.

And so now imagine that time, COVID. There's not a lot of taxi business. He's struggling. He's got a house with six kids in it and a wife, and he's doing everything he can. And he's got Mr. Patel, who runs these gaming casinos, and he's driving and he's his best customer.

And Mr. Patel, as the government said, directed everything, was in control of everything, had all the information, fed it out little by little, tells Mr. Shand, "Look, I've got a better job for you."

And the evidence showed he gave in and he did something that the jury found he should have known better. He should have known better. He should have called the police. He should have stopped. He should have done all of that. That's the case for everybody that appears before you.

But the real issue here, what was the motivation?

What did the government show that he did with the money? He paid his mortgage. He paid for his kids. He didn't go out and spend it on gambling. He didn't go out and spend it on drugs. He didn't buy a car. He didn't do anything.

So he, in a time of weakness, made a choice that was illegal and a choice that, as I wrote to you, Judge, clearly had to have been tied up in his own immigrant experience, his own understanding, that I'm sure he must have dealt with, of feeling, you know, I came to America. I know how great America is. I know what the United States can give. I know what it would give -- is going to give to my kids.

I did it legally, but how do I -- how does he, how does somebody in Mr. Shand's mind begrudge that of another human being, who the government calls victims, for coming to America with hope?

I'm sorry. The hypocrisy coming from the United States on that argument, who now will prosecute anybody for crossing the border and call them a criminal and the president of our country will tell the world they're horrible rapists and murderers and criminals.

It's not often that I get to stand before this Court and say that this is a man who made a mistake that is isolated, a mistake that is aberrant behavior. There's no laundry list of crimes that the government can point to to

show that Mr. Shand is incorrigible.  It's the opposite.

You know, it's -- the government will talk, I'm sure, about the text messages where he describes the noncitizens as boxes, that he'll talk about we're going to get paid, we need to get paid.  Okay, that's Mr. Shand talking to the criminal, Patel, fitting in because he needs to make the money.

Because look at the other things.  Look at what was also found in the van that nobody told him to get, the juice, the water, all the stuff that he wasn't required to buy that he stopped at Walmart and picked up so that people would have something when they got here to him, the text messages -- his wife who bought Happy Meals for some of the kids.

This is not a hardened criminal.  This is not somebody without remorse.  This is not somebody without caring.  This is a good man who made a horrible lapse of judgment, a horrible lapse of judgment that all the evidence, all the inferences suggest was based upon a misguided judgment, a misguided belief that he needed to help his own family, that he needed to provide, unlike his own experience.

He's -- certainly I understand the Court is going to pronounce a prison sentence.  I asked for a prison sentence.  It is a serious crime.  It is a situation where

Mr. Shand made a horrible, horrible mistake, but the guidelines in this case, even the guidelines that the Court has found, they are punitive in comparison to who Mr. Shand is, in comparison to his role in this offense. The deaths of that family he will live with, but that responsibility lies elsewhere as well and it shouldn't disproportionately come down on Mr. Shand's shoulders.

A couple of texts that show some disregard, that's what the government is going to argue, I'm sure. Anybody in this courtroom, let's look at their phones and let's find those texts. Is anybody completely blameless in this world?

Look at all the rest of who Mr. Shand is. Three and a half years he's been on release. Not a single issue. That's going to be -- when he walks out of prison at some point, that will be the rest of his life, not a single issue.

I'm still going to ask the Court what I think the appropriate sentence is. I think 27 months sends the message that even a small role, even if you're doing it in your mind for the best intentions, there's consequences. For somebody who has never been to jail, 27 months is a real sentence. For the public, it sends a message that any involvement requires prison time. More than that, more than that is punitive and punishes him unfairly.

THE COURT: Thank you, Mr. Morrison.

Ms. Kirkpatrick.

MS. KIRKPATRICK: The defendant's sentencing position pleading in this case starts by talking about the American dream, but far from being a mitigating circumstance in this case, it's quite the opposite. It was an aggravating circumstance.

Human smuggling, by its very nature, preys upon people who are searching for the American dream and exploits them at their most vulnerable times, and that's what the defendant did. He exploited those migrants' American dreams. He may not have personally killed the family of four in this case on that January night, but he didn't save them and he had so many chances to do that.

Far from being aberrant behavior, Mr. Shand transported upwards of 60 aliens across the border at least five times, on five separate occasions, knowing how cold it was.

And he didn't save those migrants on the night in question despite the chances he had. That wasn't aberrant. It wasn't aberrant that he didn't call 911, it wasn't aberrant that he didn't tell the technician that others were out there, and it wasn't aberrant that he lied to the Border Patrol agent who asked him if there were others out there. That was cold and it was calculated and it was cruel, and that's who Mr. Shand was, at least on that January night,

and that's what we're here today sentencing him for.

Those deaths were completely avoidable, and Mr. Shand was the only person who was there on the scene who was experiencing the cold, whose car had been stuck in a ditch, who had previous experience with migrants suffering from hypothermia. He was the one who was texting the temperatures. He was the one saying it was cold as hell. He knew. He was the only one who knew. And so in many ways that makes him more responsible than Mr. Patel, who set up the events that night.

Those migrants were following the American dream. Mr. Shand, as Mr. Morrison just explained, already had his American dream. He had a wife. He had a family, a house. He owned a business. He wasn't chasing the American dream that night. He was chasing money, the almighty dollar.

The government continues to ask for the 130-month sentence that it sought in its position pleading. We recognize and respect the Court's rulings and we also recognize that Your Honor just sentenced Mr. Patel to 121 months, but we think 3553(a) supports that 130-month sentence here.

It recognizes that Mr. Shand was not the individual who set up this, but he was the individual who could have avoided these deaths, who could have avoided the terrible injuries to the fifth migrant.

That sentence would reflect the seriousness of the offense and especially, as I have repeatedly said, the tragic and avoidable deaths of that family that night.

Thank you.

THE COURT: Thank you, Ms. Kirkpatrick.

Anything else you wanted to say?

MR. MORRISON: No, Your Honor.

THE COURT: Mr. Shand, do you want to speak today?

THE DEFENDANT: No, Your Honor.

THE COURT: Okay. That's fine.

All right. Just a moment here.

(Pause)

THE COURT: Mr. Shand, you were charged in Count 1 with the crime of conspiracy to bring aliens to the United States, causing serious bodily injury and placing lives in jeopardy, and you were found guilty by the jury as to Count 1.

And as to Count 2, you were found guilty by the jury of conspiracy to transport aliens, causing serious bodily injury and placing lives in jeopardy, as charged in Count 2.

And as to Count 3, you were charged and found guilty of attempted transportation of aliens to the United States for the purpose of commercial advantage and private financial gain.

And then as to Count 4, you are charged with and convicted of aiding and abetting the attempted transportation of aliens in the United States for the purpose of commercial advantage or private financial gain.

And so the jury, after full consideration, made those findings following the trial.

So what I'm going to do here is I'm going to sentence you to the sentence -- the custody of the Bureau of Prisons for the period of 78 months.  I find that is sufficient but not more than necessary.  It is the bottom of the guideline range.

I'm not going to impose a fine.

Forfeiture has been dealt with.

And there is no restitution indicated.

I will sentence you to a term of two years of supervised release following your release from sentence. That is two years on each of Counts 1 to 4, with all such terms to run concurrently.

And as to the sentence of imprisonment, the 78 months, that is 78 months on each of Counts 1 through 3 and 60 months on Count 4, with all terms to run concurrently.  So it's a total of 78.

Now, the two years of supervised release, mandatory conditions include:

Not committing any crimes: federal, state, or

local.

No unlawful possession or use of a controlled substance.

Cooperating in the collection of DNA and working closely with the probation officer.

There is a requirement that you not possess or have access to a firearm during this period of time.

As to the special conditions, I'm only going to impose one and that is you are to provide the probation officer access to any requested financial information. If they ask for it, you have to provide it.

There is a $400 special assessment for the Crime Victims Fund.

And there is a requirement in the Justice for Victims of Trafficking Act of 2015 of a $5,000 special assessment. That would be if you are nonindigent. So the Probation Office will figure that one out, whether that applies or not.

All right. Those are the conditions of supervised release.

Let me focus on the sentence now. I've considered all of the statutory sentencing factors under Section 3553. The crime, of course it goes without saying, it was very serious. It resulted in the death of four individuals, including two small children.

As we have heard and understand, it was one of the coldest nights of a northern Minnesota and southern Manitoba winter with swirling snow that made it very difficult for people to see very far ahead and a minus 35 windchill that night.  Very dangerous conditions.

Your history and characteristics are largely mitigating.  I've taken that into account.  You appear to be a hard worker with no criminal history and a family background that was less than helpful for you to be a success and a very strong post-charge behavior in this case as well.

As to the institutional concerns, they're a little bit more aggravating.  Border smuggling is a very serious problem.  It is exploitive of victims.  Clearly a violation of United States law.

And I have considered the fact that your role was relatively minor compared to others in this conspiracy, but at the same time, you could have done something that night.  You could have told officials and even the pipeline worker that there were other people out there.  It's possible they could -- the family could have been found before they were deceased.  We don't know that for sure and we'll never know that for sure.  But at the same time, that might have made a difference to the people who were out in very severe cold weather.

In terms of sentencing disparities, there's very little comparable cases like this, so there's not much information that we can go on there. So the guidelines become certainly more relevant and important for the Court.

So, all in all, I find the sentence to be sufficient but not more than necessary.

Now, Mr. Shand, you have a right to appeal the conviction in this case. You have a right also to appeal the sentence that's been imposed in this case. Appealing the conviction includes the appeal of any ruling by the Court that you feel was improper or not an appropriate ruling.

You have only 14 days to file a Notice of Appeal once the Court files its written sentencing order, which we will try to file before the end of this week. So that's 14 days in which you have to appeal. If you wait longer than 14 days, the court will probably tell you you've waited too long and given up your right to appeal.

And if you can't afford to pay the cost of an appeal, you can ask for the Clerk of Court to prepare and file a Notice of Appeal on your behalf.

Do you understand those rights?

THE DEFENDANT: Yes.

THE COURT: Okay. All right. Let's see. Is there anything else that we specifically need to address

today?

MR. MORRISON: Judge, if the Court would be willing to recommend a designation to FPC Pensacola.

THE COURT: I certainly will, and I will note that it's for the purpose of making sure the defendant can be close to his family.

MR. MORRISON: Correct, Your Honor.

THE COURT: Okay. Anything in terms of programming or anything that you wish me to request?

MR. MORRISON: No, Your Honor.

THE COURT: Okay. Do you have any additional issues?

MS. KIRKPATRICK: Your Honor, if the government does need to move to dismiss the Indictment in this case, the government would move if that's necessary. If not, it is moot.

THE COURT: We're not sure, so I'll grant the motion provisionally just to make sure. How's that?

MS. KIRKPATRICK: That sounds good.

Additionally, Your Honor, I have indicated to defense counsel that the government is not seeking detention, but we are seeking a report date that would be close in time to today's date.

THE COURT: Okay. Usually the facility can be designated certainly within a month, sometimes sooner. Do

you have a suggestion here, Mr. Morrison?

MR. MORRISON:  I think your standard practice of the four to six weeks, Judge, is fine.

THE COURT:  Okay.  Do we have a Tuesday that's four to five weeks out there, Heather?

COURTROOM DEPUTY:  Four weeks would be June 24th; five would be July 1st.

THE COURT:  Why don't we make it July 1st, easier to remember, probably.  And, you know, sometimes it takes them a little bit longer if there's a special request for a location.

So we'll make -- you'll be notified, Mr. Shand, of the institution.  You'll have to report on Tuesday, July 1st, probably at 11:00 in the morning.  That would be the time to report.  Any questions about that?

THE DEFENDANT:  No, sir.

THE COURT:  Okay.  All right.  If you don't report then, on that date, then you can possibly be charged with a crime for failure to report for service of a sentence.

And the conditions which you have followed well over this period of time will remain in effect until that date.  All right?

THE DEFENDANT:  Yes.

THE COURT:  Okay.  Anything else from you?

MS. KIRKPATRICK:  Nothing, Your Honor.  Thank you.

THE COURT: Mr. Morrison?

MR. MORRISON: No, Your Honor. Thank you.

THE COURT: All right. Mr. Shand, I want to wish you the best. Good luck to you. I mean, I think in many respects this was a mistake. There's no question about that. In my mind, I consider it that way. Didn't really realize this would happen and certainly the money was probably good, but at the same time, it was an awful finding that night to find the four people across the border deceased.

But as far as you go, I hope that you will have a plan for when you get out. Stay in touch with your family. Take care of yourself, and we want to wish you the best. So good luck to you.

THE DEFENDANT: All right.

THE COURT: Court is in recess.

*(Court adjourned at 3:19 p.m.)*

* * *

I, Lori A. Simpson, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by: *s/ Lori A. Simpson*

Lori A. Simpson, RMR-CRR