UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------

United States of America,  )  File No. 22CR40
                           )      (JRT/LIB)
        Plaintiff,         )
                           )
vs.                        )  Fergus Falls, MN
                           )  November 14, 2024
Harshkumar Ramanlal Patel and  )  10:13 A.M.
Steve Anthony Shand,       )
                           )
        Defendants.        )
------------------------------------------------------------

BEFORE THE HONORABLE JUDGE JOHN R. TUNHEIM

UNITED STATES DISTRICT COURT

**(PRETRIAL CONFERENCE)**

KRISTINE MOUSSEAU, CRR-RPR
(612) 664-5106

APPEARANCES

| | |
|---|---|
| For the Plaintiff: | United States Attorney's Office |
| | MICHAEL McBRIDE, AUSA |
| | 300 South Fourth Street |
| | Suite 600 |
| | Minneapolis, MN 55415 |
| | |
| | DOJ-Crm |
| | RYAN LIPES, AUSA |
| | 2301 New York Avenue NW |
| | Washington, DC 20530 |
| | |
| For the Deft Patel: | Thomas C. Plunkett Law Office |
| | THOMAS C. PLUNKETT, ESQ. |
| | 101 East Fifth Street |
| | Suite 1500 |
| | St. Paul, MN 55101 |
| | |
| | Leinenweber Baroni & Daffada LLC |
| | THOMAS LEINENWEBER, ESQ. |
| | 120 North LaSalle Street |
| | Suite 2000 |
| | Chicago, IL 60602 |
| | |
| For Deft Shand: | Office of the Federal Defender |
| | AARON J. MORRISON, ESQ. |
| | LISA M. LOPEZ, ESQ. |
| | 300 South Fourth Street |
| | Suite 107 |
| | Minneapolis, MN 55415 |
| | |
| Court Reporter: | KRISTINE MOUSSEAU, CRR-RPR |
| | 300 South Fourth Street |
| | P.O. Box 1005 |
| | Minneapolis, MN 55415 |

Proceedings recorded by mechanical stenography; transcript produced by computer.

**10:13 A.M.**

**(In open court)**

THE COURT:  You may be seated.  Good morning, everyone.

This is Criminal Case Number 22-40, United States of America versus Harshkumar -- is that pronouncing it correctly?

MR. LEINENWEBER:  Yes.

THE COURT:  Harshkumar Ramanlal Patel and Steve Anthony Shand.  We are here for a pretrial conference.

Counsel, would you note appearances?  First for the government.

MR. MCBRIDE:  Good morning, Your Honor.  AUSA Mike McBride on behalf of the government.  Joining me at counsel table is Trial Attorney Ryan Lipes, who is also representing the United States.

THE COURT:  Good morning to both of you.

MR. LIPES:  Good morning, Your Honor.

MR. LEINENWEBER:  Good morning, Judge.  Tom Leinenweber and Tom Plunkett who sits to my left on behalf of Mr. Patel.

THE COURT:  Good morning to both you.

Mr. Patel, how are you today?

DEFENDANT PATEL:  Good.

THE COURT: Okay. All right.

MR. MORRISON: Good morning, Your Honor. Aaron Morrison and Lisa Lopez on behalf of Steve Shand, who is present in the courtroom.

THE COURT: Good morning to both of you.

And, Mr. Shand, how are you today?

DEFENDANT PATEL: I'm okay.

THE COURT: All right. Okay. We have a number of matters to go through this morning, primarily the motions in limine. We have a superseding indictment in this case, so we should briefly handle arraignments here.

So, first of all, Mr. Patel, have you received a copy of the superseding indictment?

DEFENDANT PATEL: Yes.

THE COURT: And you've read it through?

DEFENDANT PATEL: Yes.

THE COURT: And you discussed it with your attorney?

DEFENDANT PATEL: Yes.

THE COURT: Do you wish to have the superseding indictment read here in open court today?

DEFENDANT PATEL: No.

THE COURT: So you waive the reading?

DEFENDANT PATEL: Yes.

THE COURT: All right. Thank you.

DEFENDANT PATEL:  Thank you.

THE COURT:  And, Mr. Shand, have you had the opportunity to read the superseding indictment?

DEFENDANT SHAND:  Yes, sir.

THE COURT:  Have you discussed the indictment with your attorneys?

DEFENDANT SHAND:  Yes, sir.

THE COURT:  And do you wish to have the indictment read here in open court today?

DEFENDANT SHAND:  No.

THE COURT:  Okay.  You waive the reading?

DEFENDANT SHAND:  Yes, Your Honor.

THE COURT:  All right.  Very well.

Anything else on that, Mr. McBride?

MR. MCBRIDE:  No, Your Honor.  Thank you.

THE COURT:  All right.  Okay.  Let's see.

We will have a number of matters to go through, but I want to focus first on the motions in limine, the primary purpose for this morning.  I want to get this resolved as much as we possibly can here before we are at the courthouse in Fergus Falls.

Okay.  Some of these don't require any argument. If you do wish to argue on any of them, just let me know. I do have some questions as well.

All right.  Okay.  The first one that I have is

the government's motion to introduce evidence about communications between defendants as extrinsic evidence. I think this issue has become less complicated because of the superseding indictment, but any additional argument you wish to make on this?

MR. MCBRIDE: No, Your Honor.

MR. LEINENWEBER: Thank you, Judge.

MR. MORRISON: No, Your Honor.

THE COURT: Okay. All right. Okay. I will grant the motion. I do find this is intrinsic evidence to the conspiracy itself, and so I will deny Patel's motion to exclude.

The second one I have is the government's motion to introduce evidence that Mr. Patel possessed a fraudulent Maryland driver's license. I guess this is 404(b). Anything else on this?

MR. MCBRIDE: Yes, Your Honor. Yesterday I filed a supplement to it just to clarify the government's position in light of the defense's filings. It's no longer intentioned to introduce the ID as being fraudulent, which I think would bring it under the auspices of Rule 404(b), but rather simply introducing the license itself as a piece of real evidence seized off the defendant, which is important to the case because it has a name that appears in other subpoenaed records and other places.

And so it is just intrinsic evidence of his identity and involvement in this.

THE COURT:  So there would be no reference to it being a fraudulent license?

MR. MCBRIDE:  That's correct, Your Honor.

MR. LEINENWEBER:  Judge, I would have no objection to it at that point.

THE COURT:  Very well.

Yes.

MR. MORRISON:  You know, it is a fraudulent license, and I may want to inquire about it being a fraudulent license.  I don't want to foreclose it.  I certainly can raise it before I do it in open court, but it may be relevant to my defense.

THE COURT:  Okay.  Well, before you do that, just let us know ahead of time without the jury in.  We can discuss it then.

MR. MORRISON:  Thank you, Judge.

THE COURT:  All right.  So I will, I will grant the motion at this point in time, but I will leave the issue open as to Shand's possible discussion of the license as fraudulent, but we will discuss that before that can come before the jury.

All right.  The next one I have is the government's motion to admit messages between Mr. Shand and

his wife. I think this may fall within the so-called partners-in-crime exception.

Anything you wish to say about this?

MR. LIPES: Nothing additional, Your Honor.

THE COURT: Okay. Mr. Morrison?

MR. MORRISON: Your Honor, I, as the Court is well aware, for the statements being introduced as coconspirator statements, there has to be, one, evidence that Mr. Shand and the declarant in this case, his wife, were actually members of the conspiracy; and two, the circuit requires that the statements themselves can't be the basis for proving the conspiracy, that there has to be independent evidence beyond just the statements.

That's *U. S. v. Bell*, 573 F.2d 1040 from 1978, which was also just cited in a 2024 case, *U. S. v. Norman,* as the controlling law in our district. And as far as I can tell from the exhibits, 42D and 42E are the text messages the government wishes to introduce.

42D is texts between Mr. Shand and his wife about his own travel to North Dakota, arrangements for buying tickets, hotel rooms; and 42E appears to be the text messages about Ms. Brown's travel, her own travel, to Canada, and I may have missed some. We just got a lot of exhibits, so I may have missed some.

The point being here, though, is outside of her

actual travel records to Canada, there is, as far as I can tell, no other evidence that suggests she joined this conspiracy.

Yes, she received, at least it appears, again from state coconspirator statements, that she may have received money from Patel for Mr. Shand's travel in this case.

But I don't think the government can, one, prove that she was actually a member of the conspiracy or knew the point of the conspiracy; and two, the statements themselves can't be the sole basis for that.  So I do object to any statements from Ms. Brown coming in as coconspirator statements.

THE COURT:  Okay.  Can you prove she is a member of the conspiracy?

MR. LIPES:  Yes, Your Honor.  In addition to flight records to Winnipeg, we also have car rental records that show she drove a distance that would be the equivalent of driving from Winnipeg to the Canadian border twice, which is consistent with text messages we have between Mr. Shand to Mr. Patel that night where there were two separate pickups of aliens on the U. S. side.

THE COURT:  So she was a driver.

MR. LIPES:  She was a driver on the Canadian side.  So she flew to Winnipeg.  We have records showing

her renting a Nissan Pathfinder. She then drove an equivalent of two round trips from Winnipeg to the border. She was in Winnipeg for less than 24 hours at a significant financial expense to her.

And in addition throughout the conspiracy, we have deposits of large cash sums into bank accounts that are controlled both in her name and Mr. Shand's name at times when Mr. Shand was -- cell records show he was not in Florida.

And we also have times, especially after the January 11th and 12th incident, which is the basis for her going to Winnipeg, we have bank deposits directly into an account only controlled by her.

The last thing I would note, Your Honor, Mr. Morrison noted that the text messages can't be the sole basis, and I think that's important because the Eighth Circuit law, and we cited the case, *United States v. Roach*, 164 F.3d 403.

It's a 1988 case in the Eighth Circuit, but I think it correctly states that the general principle that it can't be the sole basis, but the Court certainly can consider the text messages in determining as part of a determination of whether there was a conspiracy.

And so certainly we believe that the evidence here in light of everything, and also in light of the fact

that Mr. Shand and Mr. Patel separately discuss Ms. Stephanie Brown picking up money from Mr. Patel in text messages that are separate from the messages between Mr. Shand and his wife establish at least by a preponderance of the evidence her involvement in the conspiracy.

THE COURT: Mr. Morrison?

MR. MORRISON: There is evidence that a Stephanie Brown had a plane ticket and a Stephanie Brown rented a vehicle. There is certainly no evidence, no eyewitness, no surveillance cameras, no highway cameras that suggest she drove to the border.

Secondly, again, somebody can be unwittingly used in a conspiracy. That doesn't make them a member of the conspiracy, and without a text message -- there is no text message that is going to suggest that she was driving up to or flying up to Winnipeg and knew that she was picking up people to illegally cross the border.

There is nothing like that that I have seen. So there is a whole layer of inferences and speculation to conclude even by a preponderance standard that she was a member of the conspiracy or knew what was going on versus the just as likely scenario that she was an unwitting party to this.

So without more, even under the preponderance

standard, there just isn't enough here.

THE COURT: Anything else?

MR. LIPES: The last thing I will note, Your Honor, on the text message point is, there are actually multiple text messages on various dates where Ms. Brown is communicating with Mr. Shand about picking up people, and I will give you an example.

The first incident, which was around December 11th or 12th, Mr. Shand had messaged his wife that he was going to have them walk, referring to Harry, and he told Ms. Brown that they were not going to be alive when they got here.

Before the January 11th trip, there is a text message between Mr. Shand and his wife where Mr. Shand told his wife, "He said 8,000."

She said, "For what."

He said, "For the trip, for us."

She said, "For 15."

I note the defendant had rented a 15-passenger van for that trip.

Mr. Shand said, "Yes. What you think."

She said, "Cheap. Four for 4,000 and 15 for 8,000?"

And so we do believe that there is evidence that she was well aware of what the purpose of this trip was and

that, in addition, she sent a picture after the fact to Mr. Shand that, among other things, showed she had received $1500. She had rented a room, and she had bought food for kids, as well as having other car rental expenses, and she noted that she received $1500 for it.

So we do think in light of all of that there is a preponderance of the evidence that she did know what the purpose of the conspiracy was and she did act in furtherance of that conspiracy.

THE COURT: Anything else, Mr. Morrison?

MR. MORRISON: No, Your Honor.

THE COURT: All right. It appears to the Court that there is at least a preponderance of the evidence here that she was a coconspirator. I will reserve a final determination on this motion until we start getting into the evidence at trial.

All right. We have Mr. Shand's motion to exclude the October disclosures as untimely. Anything else on that, Mr. Morrison?

MR. MORRISON: Yes, Your Honor. I do want to make a record on that.

THE COURT: Okay.

MR. MORRISON: Judge, I laid out in my motion filings, and I think the government supplemented, too, the timing of the disclosures. I think that for me what is

most troublesome here is beyond the fact that this case has been going on for nearly two years is the fact that evidence related to elements of the offense have been in the possession of the -- I'm going to put this into two buckets.

Evidence related to -- there were two individuals arrested near the Canadian border that were brought to the Kittson County Hospital, and then one of those people, persons, was brought to the Regions Hospital here.

That all happened in January of 2022. And those two individuals are part of the serious bodily harm certainly on the transporting count because they're the ones in the United States.

So January of 2022, the medical records have been produced. Mr. Shand has been indicted. He was arrested, charged on complaint within a day of this incident. He is indicted within days, and the government on records related -- the only records they have to prove the element of serious bodily injury are not disclosed until October of this year, you know, less than -- just about a month prior to trial we get these records.

But what is more concerning in my mind is not only did the government decide not to try to get these records for two years, they did actually get a grand jury subpoena for these records on May 8th, 2024. They went to

the grand jury. The grand jury returned the subpoena.

For whatever reason they then sat on the grand jury subpoena until June 14th and then finally faxed the subpoena to Kittson County and Regions. There appears there may have been a fax earlier to Regions that didn't go through, but nevertheless, Kittson County turns those documents over, as far as I can tell, on the 18th of June.

Regions turns the documents over on June 21st. The government then sits on those documents for nearly four months, even though we have multiple orders from Magistrate Brisbois saying Rule 16 disclosures are due. We have the government affirmatively standing up in front of courts saying we've complied with our Rule 16 requirements.

Yet nothing, nothing until the eve of trial. I understand that as the government responds, I can get a continuance if I want, and I get that. If there were some level of it was just an accident, it was a new development, it was some kind of legitimate excuse from the government.

But, one, how can you excuse waiting until 2024 to get documents that are in possession and created in 2022? How can you justify sitting on the documents from June until October?

And this is not a singular to this case. This is a trend that has been happening in our district unfortunately that I have been raising repeatedly in cases

where the government is failing to meet their Rule 16 disclosure requirements, and at some point it has to stop. And there is no excuse here. There is no excuse.

And these documents that are medical records that I in preparing for trial, there is no medical records, why do I need to hire an expert? And that dovetails into the next issue, which is their expert witnesses on the death case part of this.

Originally, I didn't raise this as an issue because I wasn't charged -- my client wasn't charged with the death portion of this case until a couple of weeks ago. So I certainly didn't hire a medical examiner to review.

We get disclosures of the medical examiners. That happens on October 21st, the medical examiners are disclosed. We finally get the autopsy reports on November 1st. You know, the government is going to say, well, we had to get those from Canada. The autopsies were performed in January of 2022. The indictment comes.

Again, the waiting doesn't count here. On top of that, the Canadians haven't even disclosed everything that was part of the autopsy. They withheld all of the photos and who knows what else.

So even if, even if the Court grants a continuance for me to hire a medical examiner, to have everything reviewed, it appears the government is not even

willing or can't get all of the records required for me to properly prepare for not only an expert review of the medical examiner testimony, but even my own cross-examination if I don't even have the entire file and records that the witness is using to testify about, again, an element of an offense.

It's just at some point, you know, if we had been indicted and six months later we're here, you know, the timeliness is excusable, but this is not the case. This is two years that has been handled, and this isn't a low profile case.

This isn't a case -- we have somebody from DC, from main justice. We have had senior AUSAs working this case from the beginning that this is not permissible, especially when you're dealing with elements of the offense.

And there are thousands of other pages that were disclosed for the first time, reports from investigative border patrol officers that were disclosed for the first time in October, that were produced again back in January that were not available to me for my review when I had a motion hearing in the case and challenged the admissibility of the arrest.

There needs to be some consequences, and in this case, I submit to the Court what I'm asking for relief is,

I'm asking that the Court exercise its discretion and exclude the medical records and the medical examiners, both the substantive exhibits and testimony, as an appropriate sanction. There are still counts. The case can still move forward.

But the government needs to have some kind of sanction for this inexcusable late disclosures, and it shouldn't be that Mr. Shand should sit and wait until another six months or a year, that Mr. Patel now should sit in custody for another six months or a year while all of our schedules realign so that we can do this.

It's, it's -- there is no mistake here. It's not an accident, and I'm certainly not saying Mr. McBride did something intentional. I don't know that. I don't believe that. That's not who Mr. McBride is, but the negligence here, the collective situation with the government requires actual sanctions.

MR. LEINENWEBER: I'm sorry, Your Honor. We had previously joined in the motion. I just wanted to make that for the record.

THE COURT: All right.

MR. MCBRIDE: Your Honor, so there are a number of things that are simply wrong about what Mr. Morrison said, so I will start there. The first is, the initial complaint and indictment in this case that involved his

client did not allege serious bodily injury or death or placing lives in jeopardy. That didn't come until March of 2024 during the superseding indictment. That was the first time that that part or that element was included in the case.

So to say that we didn't go and get records that were relevant to an element of the offense is simply wrong. Once they were part of the case, the subpoenas were issued, and we did receive that evidence.

Second, Mr. Morrison said that had he known that his client was going to be on the hook for serious bodily injury or placing lives in jeopardy that he would have gotten an expert or asked for these records more specifically.

The problem with that is, the superseding indictment in March of 2024 in Count 4, his client was alleged as placing lives in jeopardy as part of the conspiracy to transport aliens.

So those things we need to level set on what the reality of the charges are and the evidence in this case. So then when we're talking about the medical records, which I think is the chief issue here, we requested them in May, received them at the end of June.

And this is where frankly I do need to eat a little crow. We had a transition in this case from my, the

original counsel. Because of the way in which she was no longer part of the case and could no longer be part of the case, the turnover was not as precise as it should have been.

And so it wasn't until the end of September and October when I made the request for the protective order that we realized that we had these medical records that had not been disclosed. As soon as we realized that, we got the protective order, and we disclosed them.

Now, I laid out in our motion that there can be no surprise on the part of the defendants about what was in the medical records. The first like 30 Bates stamps that were disclosed at the outset of the case are all statements and other police reports, border patrol reports, about the two individuals who went to the hospital and that they suffered from frostbite and hypothermia.

So, yes, the records themselves were late, but they said nothing that was unexpected in the case. And furthermore, I think our total that we're actually using at trial here have included in evidence as exhibits are, I think it's 52 pages is the total of those records that we've noticed as government's exhibits.

So even within the subset of larger records, those that are going to be used at trial are even smaller. Finally, it wasn't --

THE COURT: Is the evidence solely to prove the health impacts on the other two individuals, is that it?

MR. MCBRIDE: Correct, Your Honor.

THE COURT: There is no other purpose for this?

MR. MCBRIDE: No, Your Honor.

THE COURT: Okay.

MR. MCBRIDE: So all that is to say -- and they weren't discovered one month before trial. It was seven weeks. So I understand that we're still coming close to trial, but seven weeks is substantially more time than I think has been represented here.

So these medical records, it was not bad faith or intentional withholding on the part of the government. We requested them through a grand jury subpoena when they became relevant to the charges in the case. As soon as we knew that they hadn't been disclosed, we got the appropriate protective order and disclosed them.

That's the medical records aspect to this. When it comes to the medical examiners, the Court is well aware if the government isn't in possession of something, it can't turn it over. The prosecution team wasn't in receipt of it.

It was the entire government of the United States did not have it. We had to go through the appropriate channels to even learn the names of the medical examiners

who conducted the autopsies in this case.

We submitted that MLAT request when it became clear that this case was going to go to trial to get the documents and witnesses. That was in July, and kept in constant contact with our office of international affairs and in fact with the RCMP on the other side so they knew it was coming, could put the documents together and provide it as expeditiously as possible.

I cannot explain to the Court why it wasn't until November 1st that the Canadian authorities finally provided those documents to us. That is what it was, and it was not through any lack of trying or effort on the part of the prosecution team here.

THE COURT: Was the submission of the medical examination records incomplete?

MR. MCBRIDE: The only thing I believe is not included is autopsy photos. That was part of our specific request to Canada, and they didn't provide them. I assume there were some, because that's standard in an autopsy.

That's the only thing that I'm aware of, Your Honor. Our request was for the entire autopsy records and reports, and what we received is what we disclosed.

THE COURT: With no explanation.

MR. MCBRIDE: I'm sorry?

THE COURT: With no explanation for why the

additional possible records weren't disclosed.

MR. MCBRIDE: That's correct, Your Honor. I haven't asked that question. It wasn't raised before this, so we can certainly get the answer on whether there are photos, but that's --

THE COURT: I assume the records, the records from Canada, simply confirm that the victims froze to death, correct?

MR. MCBRIDE: Yes. That's the other thing, Your Honor. Again there is no surprise. The cause of death was hypothermia for all four victims.

THE COURT: No particular things noted other than small children?

MR. MCBRIDE: I think one of the children, the three-year-old had Benadryl in his system, but it was a therapeutic dose. That's the only other potentially compounding factor that was included.

THE COURT: All right.

MR. MCBRIDE: The remainder, I laid this out in our response as well. The remainder of the discovery that we're talking about were all subpoena -- subpoenas that were issued in August and September. We received a large volume of information. We processed it as quickly we could. We discovered it within just a couple weeks.

And then as in every case as we prep for trial,

we began to see that there were odd records, and the reports that we're talking about from law enforcement I think are not Rule 16 documents as much as they are *Jencks* material.

And so what we provided, you know, as soon as we had it in our possession and knew that it was absent, we provided it, but I think it is better characterized as *Jencks* material that, you know, wasn't even subject to the Rule 16 orders in the case.

THE COURT:  No *Brady* information?

MR. MCBRIDE:  No, Your Honor.

THE COURT:  Okay.

Mr. Morrison?

MR. MORRISON:  Fair enough.  Wasn't charged with serious bodily harm until March.  Nevertheless, in March they sat on it.  The interesting part here is, they went to the grand jury and indicted somebody, Mr. Patel with the death, Mr. Shand with the serious bodily injury, without any of the evidence.  That's problematic.

Secondly, on this issue about the transition team, it was Mr. McBride who issued the grand jury subpoena in May for the Kittson County and the Regions Hospital records.  So to say that they slipped through the cracks because of a transition from May to October is not true.

Mr. McBride was the attorney.  He issued the

grand jury subpoena. They received those records in June and failed to disclose them until October. That's not a mistake. That's not an accident.

THE COURT: So one more question, Mr. Morrison. Mr. McBride says there is no surprise here. Everyone knew exactly what happened. The medical records simply confirmed that.

What's your response to that?

MR. MORRISON: This after the fact issue of, okay, no harm, no foul, it leaves me without the ability to do an investigation. Yeah. I don't -- I have a limited budget. I can't just be hiring experts when I don't have a single medical report to give to an expert.

When I'm on the eve of trial, and nothing has been disclosed about the autopsy reports or the medical exam, I prepare to confront what evidence has been given to me, not what evidence might be out there.

That's unfortunately the way our justice system works is, I have to have evidence to review in a timely manner, to give to experts to review, to go through the process of engaging experts, once I have the evidence.

And just because in the end, you know, the Court can say, you've now had enough time, you've had a couple of weeks, well, that's not fair. That's not what Rule 16 says. It's not what Rule 16 requires.

It's not fair to Mr. Shand that I have to scramble at the last minute to do something when the rules are set up specifically in place so that justice can be orderly, so that it doesn't appear as though the government can just wait until the last minute to turn stuff over and then it's, oh, well, no harm, no foul, you can take care of it, Mr. Morrison, and, you know, you knew that people got hurt.

I may know something, but just because I know something doesn't mean it can be proved in this courtroom without the proper records, and they violated that here. And the last thing, I mean, we don't need to get into it, but I will happily go through the thousands of extra pages that they disclosed in October that they had well before that.

And I certainly will take much umbrage with the characterization that the border patrol agents' reports are *Jencks*. Their reports about observations of seeing people allegedly crossing the border, not crossing the border, footprints in the snow, that's not *Jencks*. That's Rule 16 police reports.

THE COURT: Mr. McBride?

MR. MCBRIDE: I don't have any further argument, Your Honor. If the Court has any questions --

THE COURT: All right. At this point I'm going

to deny the motion. I do feel that there is sufficient time here to review the information. It's unfortunate that a lot of it came late. Part of it was the fault of the Canadian government, as I can be clear.

I will keep this matter open as we go into trial. If it looks like there is some significant prejudice arising from some of the exhibits, I will keep that open and reconsider if necessary, but I feel at this point that this is -- in part I don't know that, I haven't seen the exhibits.

I'm guessing that it confirms what was reported at the time, that these individuals were injured because of the weather and nothing else, but if I see something and if counsel sees something that you need to raise, I will take that into account at the time.

All right. We have next a motion from Mr. Shand to require the government to provide notice if they feel that Mr. Shand has opened the door. I don't think the government is objecting to this.

MR. MCBRIDE: Correct, Your Honor.

THE COURT: And I would expect that if -- so I will, I will grant the motion, and then we will expect that if there is that belief on the part of the government, we can talk about that without the jury present first.

A motion from Mr. Shand to exclude statements

offered by the government under the party opponent exception to hearsay, I think this is kind of an attack on 801(d)(2). I'm not sure.

Mr. Morrison, do you have anything else about that?

MR. MORRISON: No, Your Honor. It's my pet project that I'm raising in every trial now.

THE COURT: Okay.

MR. MORRISON: I understand the law is there, but maybe some day the Eighth Circuit will hear me out.

THE COURT: Okay. I will deny the motion but express appreciation for Mr. Morrison continuing to raise this issue.

MR. MORRISON: Thank you.

THE COURT: We have a motion from Mr. Shand to sequester witnesses, other than one case agent. I don't think there is an objection to that. I would grant that because I typically would only allow one case agent for the government for a trial.

Okay. And then we have a motion that I think is moot, Mr. Shand to dismiss Counts 4 through 7 as duplicitous.

That's no longer?

MR. MORRISON: New indictment.

THE COURT: Yeah. So that is denied as moot.

We have a motion pending from Mr. Patel to exclude any evidence regarding Mr. Patel's immigration status. Anything you would like to say about that?

MR. LEINENWEBER: No, Judge, other -- no. I would just rely on the brief.

THE COURT: Okay. How about you?

MR. LIPES: No, Your Honor. We'll rely on our brief as well.

THE COURT: Okay. Well, I'm going to deny the motion. I think that there is some necessity here, but I will order the government not to refer extensively to his immigration status or to refer to it in any kind of derogatory status.

Okay?

MR. LIPES: Understood, Your Honor.

THE COURT: All right. We have a motion from Mr. Patel to exclude photos, videos, of autopsies, which we don't have, and then the photograph of the victims and then the photographs from the death scene.

Anything else you would like to say about that?

MR. LEINENWEBER: Well, Judge, I would also seek to exclude any extraneous photographs of, let's say, the family that perished, photos of the family that perished.

THE COURT: There is one photo that was found in a backpack. Is that one of your exhibits?

MR. MCBRIDE: Yes, Your Honor. That is correct, and it is our intention to introduce that as evidence linking the family to the backpack.

THE COURT: No other family related pictures?

MR. MCBRIDE: No, Your Honor.

MR. LEINENWEBER: That's fine, Judge. Thank you.

THE COURT: Mr. Morrison?

MR. MORRISON: Judge, I would join. Government's Exhibit 54 is the crime scene photos of the deaths. There are twelve photos. It's, as the Court has already pointed out, as the government has talked about, it's obvious of how the individuals died.

Quite frankly, I don't think we need any of the photos in that they only serve to inflame the prejudice of the jury. These are children that have died, and given the government's representation that it's obvious they died of exposure to the cold and everything else, there is no relevance to the crime scene photos in this case.

Officers can describe where the bodies were found, but otherwise it's just prejudicial.

THE COURT: What is your intent here?

MR. LIPES: Your Honor, we do intend to show, and I think it's approximately twelve photographs that were taken by the Royal Canadian Mounted Police on January 19th of 2022.

The photographs here, obviously they show the death of this family. That's always, some amount of disturbingness with anything like that, but I would say that they're in general less graphic than many crime scene photos I've seen or used in murder trials or things like that.

The photos here serve a very particular purpose which are, these are going to be the only way that the jury sees the area that the migrants were expected to walk through on the night of January 19th, 2022.

And that's going to be particularly relevant to us proving the risks that would have been taken by these migrants, and so we do think that both because the fact of how these migrants died is relevant to elements of the offenses we have charged and because the pictures themselves are going to be really the only evidence from the Canadian side of what this actually would have looked like for the migrants when they were crossing, we do think it's relevant in this case.

THE COURT: How many pictures are really necessary?

MR. LIPES: I believe we have twelve. I believe we could slim that down. Some of them are showing the same thing, so we could slim that down. I will say the bodies were found in two different areas, so for that reason,

there is a little more photographs than probably otherwise would exist, but we can certainly slim it down to a handful of photos, Your Honor.

THE COURT: I will reserve ruling on this. I would like to see the photographs if I could review them in camera before making a final decision, and I think slimming down is probably a good idea.

Yes, Mr. Morrison.

MR. MORRISON: I want to add that the government does have photos that were taken by BPA Oliver, one of the border patrol agents, of the scene looking into Canada, showing the bleakness of the territory from the day. So there are other photos to show what the area looked like at the time.

MR. LIPES: Just on that point, Your Honor, those photographs are actually from a different day of the conspiracy, not January 19th.

THE COURT: Well, the government would submit all twelve photos. I'll review them in camera, and I think you should spend a little time thinking about whether you need all twelve before we return to discuss this issue. All right?

MR. LIPES: Okay.

MR. MORRISON: I'm sorry to keep causing problems, Judge.

THE COURT: That's all right. That's all right.

MR. MORRISON: I just want to be clear. I understand the government is introducing the photo of the family, and I do for the record object to it as not relevant and it's prejudicial.

But I also want to at this time if the government is attempting to do any kind of spark of life testimony related to this family through an agent, through anybody else, I'm, I do want to be heard on that issue, if that's what the government's intent is.

MR. LIPES: We do not anticipate any testimony like that. The testimony is going to be about, it's really a photograph taken by border patrol that was of several passport sized head shots of members of the Patel family that were found in a backpack on one of the migrants that had crossed into the U. S.

So the relevancy for us is that it links the deceased Patel family with the group of migrants that actually made it across to the U. S. That's the only photographs we're intending to use, and we don't intend to have spark of life testimony.

THE COURT: All right. We'll defer finally ruling on that motion by Mr. Patel.

Okay. We have a motion to require revealing the identities of intended witnesses prior to the trial, the

close of trial the prior day. That's my expectation, the night before that the defense has exactly who is going to be called.

If there are problems with travel, which there sometimes are for witnesses, I think we just solve that by having additional witnesses that we may not have time to hear during the trial but were available to testify. I just want to make sure that there is not a witness who shows up to testify say on Wednesday that the defense was not aware of Tuesday night.

Okay?

MR. LEINENWEBER: Thank you, Judge.

THE COURT: Okay. So I will essentially grant that motion, but that's my normal practice, to require the list. Every witness needs some preparation.

Okay. And then we have a motion by Mr. Patel to direct the government to refrain from eliciting opinion evidence from any testifying witnesses as to the truthfulness of Mr. Patel's statements or opinions. I think this is the rule, but what's the plan here?

MR. LIPES: As we said in our response, Your Honor, we agree that it seems to be the rule. We obviously are going to follow the rules of evidence. It's hard to actually respond to that without any specific factual issue because some of that rule will depend on whether Mr. Patel

testifies.

And I did flag, I won't put it on the record but it's in the brief. I'm aware of one issue that I'm aware of with his immigration paperwork that we have turned over that I do think would be unfair for us to inquire on if he testified.

Barring from him testifying, we have no intent of introducing any testimony like that.

THE COURT: If he does testify, decides to testify, which is his right, then let's talk about this before that. Okay?

MR. LIPES: Thank you.

THE COURT: All right. Okay. Then Mr. Patel has a motion to prohibit the government from offering any previously undisclosed expert testimony, I think we have disclosed the five experts, correct? No one else?

MR. MCBRIDE: That's correct, Your Honor.

THE COURT: Okay. So I will just deny that motion because the disclosure of the five experts has already been made, and we won't expect to see anyone new.

Okay. Mr. Shand has a motion to exclude the testimony of the North Dakota state climatologist testifying about frostbite and hypothermia. Anything else here? This has to do with qualifications, primarily, correct?

MR. MORRISON: Qualifications, and obviously the common sense stuff, but if he is going to start talking about, you know, the cause of death is from frostbite and he knows that, he doesn't have the background for that.

So that's my main concern, Judge.

THE COURT: Mr. McBride?

MR. MCBRIDE: Yes, Your Honor. I mean we're not going to have the climatologist talk about the cause of death of the migrants. He will discuss if you are out in the cold when it's really cold, in ten minutes you might get frostbite, you might get hypothermic, which is well within his ken.

THE COURT: And I'm sure you will lay the qualifications for that first?

MR. MCBRIDE: Yes.

THE COURT: Okay. I will deny this motion with the possible exception if he is going to start talking about cause of death, which I don't think is his expertise.

Okay. And Mr. Shand has a motion to exclude the I-213 forms for the alien victims. Go ahead, Mr. Morrison.

MR. MORRISON: Your Honor, this is Government's Exhibits 18 through 24. The I-213 forms, as both sides have briefed on this, of course, have in the circuits that do more of these cases than us often, most often found either no error in the admission as they were admitted.

It's clear from all of the cases that certainly there are redactions to these I-213 forms. Unfortunately, it's not always clear from the other circuits what those redactions are. And generally other circuits have found these admissible as business records and not law enforcement criminal investigative reports.

And I appreciate that, and I understand that. But a general finding by a court somewhere or a general finding that a document is something that's normally kept in the ordinary course of business so that it falls outside of the criminal investigative report prohibition still requires context.

Just because that document traditionally is prepared in that manner, traditionally is kept in that manner and traditionally is admissible doesn't mean if the document was prepared in a case only for criminal litigation that it becomes admissible.

How the document was prepared is very important, and the cases that have the circuits that have addressed this all mention that. In this case, how the I-213s were created, how they were maintained, shows these are not administrative immigration documents, but they were created in anticipation of this litigation.

As the Court knows, this from the date of the arrest to the criminal charges are quick, but even on the

ground, it's quicker. When the border patrol agent arrives and meets Mr. Shand in the van, he communicates to his fellow border patrol agents we have a smuggling case. That's within minutes on the radio.

Within minutes they know they have serious injuries on some of the people coming, that are found in the United States. Within an hour, they're contacting Homeland Security and having a criminal investigator come up who arrives.

From the beginning, this case is investigated as a criminal investigation clearly, and that happens all the way through. And then with this exhibit, the original Exhibit I-213 is a five-page exhibit, and the four pages that the government is recognizing are not admissible because they're narrative of a criminal investigation that are attached to the I-213 in this case.

What the other circuits talk about is, this document, this I-213, it's part of the alien's A file, their immigration file, and that's why it's coming out. That's not the case here. I asked for the A files for all of the aliens.

There are no A files for the aliens. This document was created ten hours after the initial arrest, never made it into an administrative file. It's only been part of this criminal investigation. That's the

disclosures I have.

The government confirmed in an e-mail, no A files on these aliens, or at least they don't possess them. I asked for that specifically in writing, and they don't have it. So in this case, the context of the creation of the I-213 is in anticipation of litigation of a criminal prosecution and therefore is barred.

Then just for the record to complete it, of course I'm making a confrontation challenge to this where the information on the record is, was obtained from the alleged aliens. The government doesn't need these. They've told us. They have got all of the aliens listed on their witness list.

We've received a report from at least an interview of one of the aliens. So they can bring the aliens into court, put them on the stand and testify about the information in these records, and allowing these records to come in is prohibited.

THE COURT: Mr. McBride, is there anything other than the biographical material that's really relevant here?

MR. MCBRIDE: No, Your Honor. And in fact, what we've done with the exhibits, which we have stickered and provided to the defense, is limited to the one page, which is what the Fifth, Eleventh and Ninth Circuits have all found.

THE COURT: This is all biographical?

MR. MCBRIDE: Correct, Your Honor. Who they are, where they're from, where they were picked up, all those details. The subsequent pages do elicit the report on how they entered and all that. We're not seeking to admit those, only page 1 which is explicitly what all the other circuits have ruled as nontestimonial and admissible.

THE COURT: Go ahead, Mr. Morrison. Do you object to the biographical material?

MR. MORRISON: Yeah, and that's not completely -- and maybe I should just hand it up to you, Judge.

COURTROOM DEPUTY: It's on.

MR. MORRISON: It's on? Okay.

The title of the document is Record of a Deportable Inadmissible Alien. Presumably the border patrol agents are going to talk about this I-213 document is created for people who are not legally in the United States, who are turned around at the border and have no legal basis to be here, which is an element the government has to prove beyond a reasonable doubt.

In addition, it talks about, you know, expedited removal, that the aliens are removed. So this document even in just its form nature is a document that the government is going to use, and I would imagine would use to prove that they're aliens and not legally within the

United States, because that's what this document represents.

And that's in this case given how it was created and the context of it, that's, that isn't fair. And again, I would go back. All of the circuits that have addressed this document, they're addressing it. They're pulling these documents from immigration files, not from criminal investigative files.

MR. MCBRIDE: Your Honor, so all the circuits that have addressed this have addressed it in exactly this context, that a person is caught red-handed with aliens. All aliens have this document prepared for them, and it's kept in the regular course of business. So there is nothing different about the circumstances in this case than those that have been decided in the other circuits.

I do want to be clear about something. There are A files that exist for these aliens. These documents do come from them. The government is not in possession of the rest of the A file, but these are not documents that were prepared as part of the criminal investigative file in this case.

They were made as a matter of course, as they are with every alien who enters the United States.

MR. MORRISON: I made a specific request for the A files. They exist, but the government is not in

possession. Homeland Security, it's a Homeland Security agent is their case agent. Are you kidding me? Like they are just going to say it's a different branch of the federal government. They don't office next to Mr. McBride, so he is not in possession of them.

I'm, I'm, that's impermissible, and I have no evidence, there is no evidence this document was ever in an A file. The only evidence suggests it's part of a criminal investigative file prepared for criminal prosecution in anticipation of litigation. End of story.

THE COURT: Can the A files be obtained?

MR. MCBRIDE: So, Your Honor, the A files are possessed, I believe it's USCIS that is the agency that possesses. It's not HSI. There are many parts of them are subject to statutory nondisclosure laws. It's a very fraught area.

There is nothing that we're aware of that would be in there that makes them *Brady* material or *Giglio* material or relevant to this case in any way. The I-213 is the record of deportable and inadmissible alien, and that is what is commonly produced and used in these cases.

THE COURT: Might it show prior criminal activity or something like that that could be used to undermine testimony?

MR. MCBRIDE: Your Honor, to the extent that the

A file may for those witnesses we expect to testify, we have provided the criminal histories to the defense. We have one migrant that we expect to testify at this time because it's the only one that has gotten in touch with us and is available, and we have provided all of that separately within our disclosures.

MR. MORRISON: Yash Patel is who the government's noticed is going to testify. He has a similar to Exhibit 18 where it says immediately expedited removal. He's still in the United States two years later.

If they have never seen the A file, he is here for some reason, and that is relevant to his motivation to testify for the government. They can't assure me, Mr. Shand or this court that there is not *Brady* within the A file if they haven't even seen it.

THE COURT: He's the only witness?

MR. MCBRIDE: He is the only one of the migrants at issue in this case who we expect to testify at this point. We did issue subpoenas for all of them, but only two have gotten in touch with us, and he's the only one that we expect to testify.

THE COURT: Can the A file be produced under seal?

MR. MCBRIDE: I mean, Your Honor, we could certainly request. I don't know if USCIS will provide it

to us.

THE COURT: I mean, I could issue a court order.

MR. MCBRIDE: Yes, Your Honor.

THE COURT: I mean, I think the defendants, and it's only a single witness, so it's not a burden to hunt down, you know, 30 files or something like that.

I think they have a right to look at it under seal just to make sure that there is not something in there that they can't use to, to effect their cross-examination.

MR. MCBRIDE: Your Honor, I guess, if the Court orders me to go get it, I will do so. The government is objecting to producing it as outside the scope of the disclosures in this case, Rule 16 or otherwise.

THE COURT: Yeah. I think it's a good idea to find it, so I'm going to order you to do it. If you need a court order, the Court can do that, and it would be under seal and returned, of course.

MR. MCBRIDE: May I have a moment, Your Honor?

**(Counsel confer.)**

MR. MCBRIDE: Your Honor, my colleague informs me that the A files are not kept in electronic form, that they are a physical document itself, and so it may, it may take a while for us to get the physical document to be able to provide it.

If the Court orders it, we will work on that as

expeditiously as possible.

THE COURT: Okay. Let's go ahead and do that. Okay?

All right. But the exhibit itself, as long as it's simply that front page, the biographical information, the Court will permit that to be admitted.

Anything else that is attached to that document would not be admissible.

MR. MORRISON: Judge, could we have then the record of deportable and inadmissible alien redacted as well from that exhibit?

THE COURT: That's probably fairly hard to do with the nature of the form. I think you could explain to the jury why he is not deported, if there is a reason.

MR. MCBRIDE: Yes, Your Honor. I mean, the name of the form is not testimonial hearsay. We are going to have a witness explain what the form is, and so to the extent that cross-examination is needed to explain that, they will have a live witness to do so.

THE COURT: Well, I think it needs to be explained because otherwise the jury is going to look at it and say why hasn't he been deported? It's been two years. Given the deportation issue, shall we say, they're going to note that right away.

MR. MCBRIDE: Yes, Your Honor. Absolutely.

MR. MORRISON: So but what do I do about the other six alien I-213 forms where we don't know the status of these people? Now they have got a form that says these people were aliens and deported and proves their element, and I have no ability to -- I don't know if they are still, all of them are still in the country.

This is the first I've heard that two of them were. I knew one, but this is the first I heard there was a second one that was still in the country. How is that -- that's not --

It becomes a proof of the element essentially without any ability to explore and know if the person was deported or is still in the country and to make an argument that they weren't illegally in the country.

THE COURT: Well, I'm not sure that you can introduce an exhibit about someone that you don't know their status right now.

MR. MCBRIDE: Your Honor, so I think the statute specifically addresses this. I mean, if you look at our indictment, it says regardless of whether such aliens -- I'm sorry.

It says, regardless of any future official action which may be taken with respect to such aliens. So I think the statute fairly covers this that subsequent actions are irrelevant to whether they were unlawful when they entered

the United States.

The purpose of this document is to demonstrate that they came into the United States unlawfully and who they were, where they were from. And so irrespective of whether they remained here for another purpose changes nothing about the fact that the element of the crime here is that they were brought into the United States unlawfully.

The statute fairly covers this, and there is really no relevance to subsequent action.

MR. MORRISON: Judge, and I'm sorry. This is important, but this is an element that they're proving where they get to bring a document created by the government that says they're illegally here in the country, an element of the offense; and one, we just have to accept the document as truthful.

I don't get to cross-examine -- has a border patrol in the history of our nation ever made a mistake and excluded somebody with an I-213 document that actually should be in the country, is legally allowed in the country?

That's the danger of this document coming in even in the form that you're allowing it in is that it sends the message that that person was illegally in the country at this time, and I have no ability to challenge that because

I don't have A files of people. I don't know if the people are still here.

I don't know if the government made a mistake. Instead, they just filled out a document that says they're illegal, and now that becomes the substantive evidence for six of the seven aliens that they weren't here legally, and I only get to examine and cross on one of the aliens. That violates confrontation.

MR. MCBRIDE: Your Honor, again, the statute fairly covers this. I mean, our charge is not, says to bring aliens to the United States at a place other than a designated port of entry and a place other than as designated by the commissioner. There is going to be lots of testimony in this case about them walking across a field.

So there is ample opportunity to cross-examine on that. This is simply not an issue in the case.

MR. MORRISON: That might be for Count 1, but for the rest of the counts, it's transporting an alien in the United States. So that's not the bringing across, and they have to prove that the person is, that's in the United States, that these seven are in the United States when they're arrested, were here as aliens.

THE COURT: Can't you cross-examine on that question, and if they don't know the answer, they're going

to say they don't know. They say this is a form we use for anyone we catch walking across the border. We don't know ultimately whether they're going to be deported or not, and isn't that a subject for cross-examination that might help you?

MR. MORRISON: Yeah, except for, except for my problem is, is that I don't have all the information about -- so the agent says that, and then I can't come back and say, well, the A file here shows you might have made a mistake, agent, on this and that this person actually was legally here in the country because the government is not disclosing the A file or the information that might allow me to prepare that cross-examination, versus just asking an adversarial witness what that form is about.

THE COURT: But if the witness says they don't know whether the person was an alien to be deported, don't you, haven't you created reasonable doubt?

MR. MORRISON: We know that, yeah, it may be if the person says that, but they filled the form out and stamped on it expedited removal. On top of that, the person who filled out these forms and signs the forms isn't even on the government's witness list.

So we have an agent presumably who is going to testify about these forms who didn't even prepare the forms. So how can I, you know, now we're talking about

hearsay within hearsay on a form.

MR. MCBRIDE: Your Honor, all I will say is, this has been fairly covered by three other circuits that have all found the information to be a public record that is admissible and self-authenticating as long as you have a custodian of the records to testify.

That's what we intend to do here, and there is nothing singular about this case that changes anything of many dozens of cases that the other circuits have decided consistent with the case law that I have provided the Court with in my brief.

THE COURT: All right. I will permit just the biographical page. We're not going to do any redaction on it, but it seems the area is ripe for cross-examination.

Okay. There is also a motion from Mr. Shand to exclude passports and visas seized by the aliens. Anything else you want to say about that?

MR. MORRISON: No, Your Honor.

MR. MCBRIDE: No, Your Honor. We have photos of the passports that we're going to introduce.

THE COURT: All right. I will deny the motion assuming proper authentication of the evidence ahead of introducing the exhibit.

We have a motion from Mr. Patel to exclude the testimony of the fingerprint guy, Mr. Hellmann, is that it,

yeah, Mr. Hellmann.

MR. LEINENWEBER: It is, Judge. There were no fingerprints taken as far as I know at the scene of the crime. Certainly there were no fingerprints of Mr. Patel's at the scene of the crime. I think this would just serve to confuse the jury.

I assume the jury when they hear the words "fingerprints" that means something. As long as there has been television shows and radio drama about court cases, fingerprints is like a magic word, Judge, and under the circumstances it's prejudicial.

THE COURT: It's not quite as magic today as DNA is.

MR. LEINENWEBER: You have me there, Judge.

THE COURT: Is there a reason for this?

MR. LIPES: There is, and I believe the expert will be quite clear to what fingerprints he is comparing. He compared the arrest fingerprints of Mr. Patel to the fingerprints that were submitted with Mr. Patel's A file.

One of the complications in this case is that Mr. Patel has used several names. For example, his A file has the name Harshkumar Patel, which he is indicted under. But the license he had on him at the time he was arrested said Haresh Patel.

And some of the key records in this case are

under the name Haresh Patel, including phone subscriber records for the phone number that was communicated with Mr. Shand.

And so the point of the fingerprint comparison is to link the person sitting in the courtroom Mr. Patel with the A file, and in that A file Mr. Patel signed two different forms where he provided that phone number to U. S. Immigration authorities as the way to contact him.

THE COURT:  Anything else?

MR. LEINENWEBER:  Nothing further, Judge.

THE COURT:  Okay.  All right.  I'm going to deny the motion.  Obviously we're not going to get into any insinuation that there were any fingerprints at the scene of the crime.

Okay?

MR. LIPES:  Thank you, Your Honor.

THE COURT:  All right.  Those are all the motions I think I have right now.  Is there anything I missed, or is there anything else to raise?

MR. MCBRIDE:  Your Honor, no additional motions. Just we've talked about it a little bit, but one note I wanted to make the Court and counsel aware of is, we do have one of the migrants, Yash Patel, that we expect to testify.  He's not a very good English speaker, so we have arranged for an interpreter.

Kind of no matter where we are in the trial, on Tuesday we're going to try to take his testimony because everybody will converge at the right time, but that's the only witness we expect will need an interpreter at this time.

THE COURT: Okay. Anything else that you need to raise?

MR. LEINENWEBER: No, Your Honor. Thank you.

THE COURT: Mr. Morrison?

MR. MORRISON: No, Your Honor.

THE COURT: Okay. There is one issue that I just really started looking at, and I think it would be helpful to have the parties' viewpoint on this. It is the question of whether Count 4 is, appropriately alleges a crime under the statute.

I looked at the statute here. It is the commercial advantage and private financial gain, which is under (b)(1). If you look up in the statute, part (a)(5), the aiding and abetting criminal act there that's alleged -- that's provided for, it says, "Aids or abets the commission of any of the preceding acts."

Transport, (a)(2), but I'm not sure that if you read (3)(b)(1) it fits there because it says, In case of a violation of subparagraph (a)(1) or (v)(1) or I, I guess it's 1. I'm not sure all these numbers, (v)(1), it

doesn't -- or in the case of a violation of (a)(2), (3) or (4) in which the offense was done for the purpose of commercial advantage or private financial gain.

Is there a crime alleged -- crime that's provided for for aiding and abetting there, or are you relying on the general aiding and abetting statute? This isn't particularly clear to me whether this is a proper charge or not.

Maybe you can help me with this.

MR. LIPES: Yes, Your Honor, and the alien smuggling statute is not the clearest statute that has ever been written.

I think that this actually, if I'm understanding the Court's concern, feeds into a conversation we had yesterday about whether elements like commercial advantage and financial gain are actually elements of the offense or rather are sentence enhancements that because of *Apprendi* would require the jury to find it.

Our position is, and I think that's consistent with how this has been charged kind of repeatedly throughout the country, is that the commercial advantage or financial gain is a sentence enhancer.

It enhances the maximum sentence that can be given for someone who violates 1324(a)(1), (a)(2). And (a)(1), (a)(2) is a preceding section to the aiding and

abetting statute. So -- and I think kind of the cleanest point on this, Your Honor, is that if it was an issue to use B -- to use (b)(1), (b)(1) is the section that in any event, no matter if private financial gain is charged or not, covers the sentence for certain offenses in (1)(A).

And so if the reading was that you could not do aiding and abetting for that statute, then you couldn't do aiding and abetting for any of the preceding subsections because it says, "Shall be punished as provided in subparagraph B," and so all of the sentences for those who violate 1324(a)(1)(A) are found in that subsection (1)(B).

And so our view is that commercial advantage and private financial gain is a sentence enhancer, so it's something the jury has to find. But the actual offense is simply attempted transportation of aliens. And so for that reason --

THE COURT: If it were an element of the crime, then there would be a problem, right?

MR. LIPES: If it weren't?

THE COURT: If it were an element of the crime, rather than a sentence enhancer.

MR. LIPES: That's a little complicated just because of the way the statute is sort of broken up because parts of our offense are taken directly from (1)(A)(1). For example Count 4 it's aiding and abetting (1)(A)(2). So

if you look at (1)(A)(2), that's knowing or reckless disregard of the fact that an alien has come to, entered or remained in the United States, transports or moves or attempts to transport or move such alien within the United States.

So for that section, that's included in Count 4 and that precedes the aiding and abetting in Section (1)(A)(2). The addition of the sentence enhancer is something that we have to put in the indictment, and it's something that the jury has to find in order to receive the additional maximum sentence that the statute allows for.

But our view is that the aiding and abetting is the attempted transport, which is in (1)(A) -- I'm sorry -- (a)(1)(A)(2), and then we have added the sentence enhancer, which is in Section (b)(1). That does not eliminate the aiding and abetting.

I would also note, Your Honor, that this is in some ways, I don't want to say a moot point, but even if we didn't charge this as aiding and abetting, on Count 3 legally, we could do Count 3 as aiding and abetting under 18 U.S.C. Subsection 2, and that does not have to be alleged in the indictment.

The only reason we separate these out is because of a funky nature of this smuggling statute where aiding and abetting actually gets a lesser sentence, and so when

you charge it under Subsection 2 there has been some legal challenges to what the maximum sentence can be.

So make it clean, we generally use the aiding and abetting that's in this statute, but even if the Court eliminated Count 4, you still could have 18 U.S.C. Section 2 instruction that a person is guilty of the offense if they're a principal or if they're an aider or abetter.

I hope that makes sense. It's a confusing statute, Your Honor.

THE COURT: It is.

MR. LIPES: But I do think in this circumstance, the commercial advantage is just a sentence enhancer. The offense for aiding and abetting is preceding the aiding and abetting provision.

THE COURT: Okay. Defendants wish to be heard on this point or not today?

MR. LEINENWEBER: No, Your Honor.

THE COURT: Do you want to take some time to look at it or not?

MR. LEINENWEBER: I do not.

THE COURT: Mr. Morrison?

MR. MORRISON: I guess I should take some time to look at it, Judge.

THE COURT: Okay. Would you set forth your view on this in a letter by tomorrow, and then Mr. Morrison will

have something to work off of?

MR. LIPES:  Yes, Your Honor.

THE COURT:  All right.  And that would be helpful for the Court, too, because it is a confusing statute. There is no question about that.  I think we can agree on that.  It's a confusing statute.

Okay.  And then, Mr. Morrison, anything you wish to respond on that, I'm perfectly happy to read.  Okay. All right.  Just a few more points, and we will wrap up here.

So I will have a pretrial PowerPoint that will be ready on Monday morning.  I'm not going to take time to go through instructions right now because we've got another matter pending here today.  However, I will send a new draft of the instructions and the verdict form probably by tomorrow.

And then we will spend a little time Monday morning.  If there is enough of an agreement for our jurors to have a preliminary copy of the instructions during the trial, I think that's helpful for them for their comprehension.  If we can't get far enough to do that we will wait until the end of the trial.  Okay?

But I will send a redraft out tomorrow.  I appreciated receiving the questions for the voir dire process.  That will help us go through that relatively

KRISTINE MOUSSEAU, CRR-RPR
(612) 664-5106

quickly.  I'm thinking two alternates?  Does that sound all right?

MR. MCBRIDE:  Yes, Your Honor.  I think we will be done in a week, so I don't see the need for more.

THE COURT:  Two alternates okay?

MR. MORRISON:  Yes, Your Honor.

THE COURT:  The Court's schedule will be with the jury 9:00 to 5:00 each day with an hour break for lunch.  We won't go beyond five o'clock.  If we're done with a witness at quarter to 5:00, we will quit at quarter to 5:00, and we don't start with the jury before nine o'clock Monday morning.

We have a number of matters to discuss.  If you could be there by eight o'clock, we will get started talking about some of these issues we need to wrap up.

Opening statement, who is doing it?

MR. MCBRIDE:  Mr. Lipes is.

THE COURT:  How long?

MR. LIPES:  Less than 20 minutes.

THE COURT:  Are you doing opening at the same time at the beginning?

MR. LEINENWEBER:  I am.  Less than 20.

MR. MORRISON:  Ms. Lopez, same time frame.

THE COURT:  Very well.  Sounds good.  Do you have the first day witnesses or not?

MR. MCBRIDE: Your Honor, so we have two witnesses who are going to be on standby on Monday in the event we get to them.

THE COURT: We should get to them in the afternoon, yeah.

MR. MCBRIDE: They are Mr. Daryl Ritchison, our climatologist, and Mr. Troy Larson. They are both relatively quick witnesses, but they will both be prepared to testify on Monday.

THE COURT: Okay. All right. And we will use the electronics that we have a new system in that courtroom, so that should work just fine. We do have now iPads for the jurors to see the exhibits as they are admitted.

Some jurors like to use them apparently. Others if they're doing a lot of writing, it's harder to use. There will be a big screen in front of them, so they will see them that way as well, but sometimes they want to look at something up close, so they will have it in front of them.

Any questions?

MR. MCBRIDE: Just one because this is only my second trial in front of you. Am I correct you will handle the voir dire? We won't be asking any questions.

THE COURT: Yes. I will have you up after I

finish going through with them individually to see if there is any follow-up questions you would like me to ask.

MR. MCBRIDE:  Thank you.

THE COURT:  Anything else?

MR. LEINENWEBER:  No.  Thank you, Judge.

MR. MORRISON:  Thank you, Judge.

THE COURT:  Okay.  We will send out the redraft of the instructions tomorrow, and we will look forward to seeing everyone on Monday morning.

MR. LEINENWEBER:  Thank you, Judge.

THE COURT:  We will be in recess.

COURTROOM DEPUTY:  All rise.

**(Court was adjourned.)**

\*         \*          \*

I, Kristine Mousseau, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Certified by:  s/  *Kristine Mousseau, CRR-RPR*
Kristine Mousseau, CRR-RPR